THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN F. PALMER, Defendant-Appellant.

Second District   No. 84—0436

Opinion filed December 31, 1985.—Rehearing denied February 5, 1986.

Steven Clark and Sue Augustus, both of State Appellate Defender's Office, of Chicago, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE NASH delivered the opinion of the court:

After trial by jury defendant, Steven F. Palmer, was found guilty, but mentally ill, of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)) and of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2). He was sentenced to an extended term of natural life imprisonment for murder and appeals, contending (1) the State failed to prove defendant sane beyond a reasonable doubt; (2) the court erred in its instructions as to insanity, and (3) in giving an instruction which defined mental illness; and (4) that the court abused its discretion in imposing a sentence for a term of defendant's natural life.

It is undisputed that on December 28, 1983, defendant who was then approximately 32 years of age, stabbed 14-year-old Timothy Degan in the back and neck as they stood in line at a McDonald's restaurant in Waukegan, causing his death. An employee of the restaurant testified that at 1:25 p.m. he observed defendant exchange words with Degan, and defendant then seized Degan by the neck and took him towards the door, where defendant stabbed the boy and ran outside. Another employee testified he saw defendant overpower Degan and recognized defendant as a person who had argued with another customer two or three months earlier.

After the stabbing, defendant ran to a bowling alley two doors away carrying the knife in his hand. He was mumbling that "she kicked me" and went into the pool room where he slashed table covers and threw bottles and pool balls against the wall. Defendant yelled obscenities and "come on Waukegan, here I am, come and get me." When the police arrived defendant dropped the knife and was cooperative; he did not appear to the police to be under the influence of drugs or alcohol and told them he had "cut a kid at McDonald's."

At the police station, defendant was advised of his *Miranda* rights and waived them. Defendant told the officers that he had been in the same McDonald's restaurant two weeks earlier when a little girl had kicked him and her mother did nothing about it. He was still angry about the incident when Degan, a young, white male, bumped defendant with his elbow, gave him a dirty look and a finger. Defendant stated he took his knife from his pocket and stabbed the boy in the neck then ran to the bowling alley. There, defendant saw two little girls and felt like killing them.

In a second statement later that day defendant told the officers

that he knew he had done something wrong in stabbing the boy and that he had always done wrong. Defendant related that he had been in the Navy once for nine months, but was dismissed for fighting. He gave his life history, naming the schools attended, where the family had lived and the names and ages of his parents and three sisters. The officers testified defendant appeared normal and did not seem to be under the influence of drugs or alcohol.

Defendant's father testified in trial that defendant's behavior was normal until age 17. At that time a high school track coach called advising that defendant was running aimlessly around the track and the coach thought he had problems. The parents took defendant to a Joliet psychiatrist, who diagnosed adolescent schizophrenia and advised medication and regular therapy. In 1969, when the family moved to Iowa, defendant was regularly treated by private psychiatrists. The father described how defendant would become angry for no apparent reason and would wash his hands 30 or 40 times daily with kitchen cleanser, sprinkling it all over the bathroom. Defendant smashed a window in the family car, later stating he did not know why he got mad. Defendant told his father he heard voices and he would at times talk incoherently about things. He was eventually placed in the Pine Knoll Mental Health Center in Davenport, where defendant remained for a year as an inpatient.

The family returned to Illinois in 1973, where defendant was employed for brief periods. In 1975 defendant joined the Navy, where he served for 11 months until being discharged for fighting; psychiatrists who examined him then said defendant had a nervous breakdown. Defendant did not inform his parents of his discharge from the Navy, and they next heard from a sheriff in Missouri who advised them that defendant had been walking aimlessly down the highway and the sheriff had put him on a bus to the Veterans' Administration hospital in Iowa City. The father went there and was advised by Dr. Jerry Lewis, a psychiatrist, that defendant had paranoid schizophrenia. He was given medication and treated for six weeks, then transferred to the Veteran's Administration hospital in North Chicago where defendant was treated for nine months. Defendant returned home for a time then moved to Leavenworth, Kansas, where he lived by himself for several months; he also spent several months in the Veterans' Administration hospital at Leavenworth as a patient. Defendant again returned home for a time, then went to New York where, in 1980, he was arrested and committed to Bellevue Hospital for 90 days. Defendant returned home for a period, during which time he heard voices from the radio and television talking to him. He was on medication and being treated

then as an outpatient of the Veterans' Administration hospital. Defendant's father often drove him to the hospital, at defendant's request, when he felt upset. Defendant would be suspicious of everyone, stare at people and was very nervous. He could usually carry on a conversation when in that condition and mood changes would come on sometimes instantly, lasting minutes or perhaps a few hours.

In 1983, when defendant was living in his own apartment, he called his father, requesting to be taken to the Veterans' Administration hospital. Defendant looked very nervous and upset, and, without having said anything, he attacked his father as they were driving. The father's glasses were broken and his shirt ripped off; he got away and called the police from the hospital. Shortly thereafter defendant appeared at the hospital, where he was committed for three or four days.

During 1982 and 1983, defendant was still under medication and would be upset and nasty when he had not taken it. The father sought to have defendant committed for inpatient treatment on several occasions, and he would be held for 90 days, then released. Within the year before trial, defendant was in court on another matter when he threw a book at the judge, hitting him. He also was in an altercation at the McDonald's restaurant where he kicked over garbage cans. The father attempted to restrain defendant, but he broke away and struck a man. The police arrived and defendant surrendered without a struggle.

The father also testified defendant had been arrested on a number of occasions since his teenage years because of his "acting up"; he also had tried cocaine and LSD in 1970, and marijuana later. In the year prior to trial, defendant was being treated as an outpatient at Downey Veterans Hospital, where he would receive a shot of Prolixin every two weeks. The father at one time procured a restraining order in an effort to keep defendant away from the parents, who were afraid to have him in the house. Over the years defendant had been diagnosed as having schizophrenia, immature personality, narcissistic and antisocial behavior problems by various doctors.

Officer Ed Davis of the Waukegan police department testified that on October 19, 1981, he interviewed defendant relating to an assault on a customer in a restaurant by defendant with a drinking glass. Defendant told him a black man walked in and began smiling and defendant struck him in the head with the glass. When asked why he had done so, defendant replied he hated blacks since being in the Navy as they had messed with his forehead and defendant felt that his brains were coming out of his mind. Defendant was cooperative in

the interview, answering the officer's questions and following directions. The witness also described another interview with defendant on December 5, 1981, relating to an incident in Gojo's Restaurant when defendant had threatened customers with a hatchet. Defendant stated he went to the restaurant to get coffee, and when he saw a black woman inside he threatened her with a hatchet he was carrying and also chased other black customers, who ran from the restaurant. Police officers arrived and defendant was arrested; he was cooperative in the interview. The officer also testified that after the incident in October 1981, he signed papers in the State's Attorney's office to cause defendant's commitment as a mentally ill person. Defendant was committed to the Elgin State Hospital on October 23 and released on November 2.

Defendant presented the testimony of three expert witnesses. Dr. Jang-June Chen, a psychiatrist, treated defendant at the North Chicago Veterans' Administration hospital from May 1982 through December 1983, and last saw him on December 15, 1983. Defendant was hospitalized under Dr. Chen's care approximately 10 times within the year and a half prior to the present offense.

Dr. Chen had initially diagnosed defendant as having bipolar effective disorder and antisocial behavior. Based on defendant's persistent delusions, hallucinations and behavior problems, Dr. Chen changed the diagnosis to schizophrenia or drug-induced psychosis; in his opinion, defendant could have both disorders. Defendant had admitted taking LSD when he was 19 and using cocaine approximately 20 times in 1983. Dr. Chen prescribed Prolixin injections, and defendant showed improvement after taking the medication. Dr. Chen stated that a patient with an antisocial personality would not be able to tolerate Prolixin. Dr. Chen believed that defendant's psychosis was severe and that he was not faking.

Dr. Leo Goldman, a psychiatrist, examined defendant at the county jail after this offense, and had also previously treated him 10 years earlier at the Lake County Mental Health Clinic. Defendant told Dr. Goldman that on the morning of December 28, he had gone to the Veterans' Administration outpatient clinic complaining of hearing voices, feeling extremely anxious and fearing that he might do something. The hospital refused to admit him and he went to McDonald's, but didn't have any money so he left. He later returned to McDonald's where he heard intense, derogatory voices and stabbed a young man whom he thought said something to him. In Dr. Goldman's opinion, defendant suffered from the disease schizophrenia, paranoid type. Defendant had recurrent delusions, namely that his head had

been operated upon and something was put in there and that something was written across his forehead that only blacks could see, and they were out to get him. Dr. Goldman stated that he believed that defendant was unable to either distinguish right from wrong or to conform his actions to the requirements of the law at the time he stabbed Thomas Degan.

Dr. Goldman further testified that a paranoid schizophrenic can be extremely bright, have no memory impairment and be reality-oriented. He stated that a psychosis is a mental state that can occur in a schizophrenic, in a person with organic brain disease, in a person with severe depression caused by street drugs, or in someone who has developed a toxicity to prescribed drugs. Drug-induced psychosis occurs after a relatively recent ingestion of drugs and, after a psychotic episode, a schizophrenic may even have some insight into his conduct. Frustration could stimulate a psychotic episode. Dr. Goldman testified further that a person who has an antisocial personality disorder cannot be treated with antipsychotic drugs and that a person cannot be both antisocial and schizophrenic. Dr. Goldman believed that defendant was suffering from schizophrenia when he stabbed Degan, because he was behaving in a chaotic manner, hearing voices and misinterpreting things around him. The fact that defendant's anger over the little girl kicking him was rekindled two weeks later was consistent with a schizophrenic's loss of the element of time.

Dr. Marshall Silverstein, a clinical psychologist, administered psychological tests to the defendant. He believed that at the time of the stabbing defendant was suffering from the mental disease schizophrenia and was unable to conform his conduct to the requirements of the law. He considered these findings were inconsistent with a diagnosis of antisocial personality disorder. Dr. Silverstein stated it was not possible defendant faked his symptoms.

Dr. Ronald Baron, a psychiatrist, testified for the State. He examined defendant at the county jail where defendant told him about the events of December 28, saying that on that day he had felt sick and upset. He had heard voices saying people were picking on him and telling him that the only way to get help was to strike out at somebody and then get the help. In Dr. Baron's opinion, this was not the type of voice which a schizophrenic would hear and he believed that defendant was not being straightforward. Defendant also told Dr. Baron that he stabbed Degan because he thought Degan sneered at him. Defendant also said he knew what he did was wrong.

Dr. Baron disagreed with the diagnosis of paranoid schizophrenia; however, he could not say for certain whether or not defendant was

schizophrenic and considered he was most likely suffering from drug-induced psychosis. Dr. Baron saw no evidence of psychosis at the time he interviewed defendant; however, he believed that defendant was grossly psychotic on the day of the stabbing. Dr. Baron agreed that if defendant was schizophrenic and under medication, he would appear, more or less, without symptoms and that it would be unusual to treat a person with a history of drug abuse with Prolixin. While defendant denied taking any street drugs or alcohol at the time of the stabbing, Dr. Baron stated that this was probably a lie since defendant had a history of drug abuse and complained of symptoms indicative of drug use at the time of the offense. A schizophrenic could have the same symptoms. Dr. Baron did not examine defendant physically for any signs of drugs, and there was no medical record of any laboratory tests for drugs. Dr. Baron believed that defendant's quick remission after the incident was unusual for a schizophrenic.

In Dr. Baron's opinion, defendant knew the difference between right and wrong and had the ability to conform his conduct to the requirements of the law. He testified that it was debatable whether defendant had impulse control, although he showed control by quickly surrendering to the police. Dr. Baron concluded that defendant was not mentally ill.

■ Defendant contends the finding of guilty, but mentally ill, should be reversed because the State failed to prove his sanity beyond a reasonable doubt. Once a defendant has presented enough evidence to raise the defense of insanity, the State is required to prove his sanity beyond a reasonable doubt. (*People v. Silagy* (1984), 101 Ill. 2d 147, 168-69, 461 N.E.2d 415; Ill. Rev. Stat. 1981, ch. 38, pars. 3—2, 6—2.) (The present offense occurred before the effective date of Public Act 83—288 (1983 Laws 2035-36) amending Ill. Rev. Stat. 1981, pars. 3—2, 6—2 which, as of January 1, 1984, placed the burden of proof on a defendant when the insanity defense is raised.) The question of whether a defendant was sane at the time of the offense is for the jury, and its decision will not be reversed unless so improbable or unsatisfactory as to create a reasonable doubt as to defendant's sanity or so palpably erroneous as to suggest its basis was passion or prejudice. *People v. Silagy* (1984), 101 Ill. 2d 147, 169, 461 N.E.2d 415.

■ Discrepancies in testimony are matters for the jury's determination, and it is free to disregard an expert's conclusions of fact. (*People v. Grice* (1984), 121 Ill. App. 3d 567, 568, 459 N.E.2d 1122.) The weight to be given an expert's opinion is measured, in part, by the factual details supporting his conclusions. (*People v. Martinez* (1980), 86 Ill. App. 3d 486, 491, 408 N.E.2d 358.) The trier of fact may reject

expert testimony and base its findings on lay testimony (*People v. Spears* (1978), 63 Ill. App. 3d 510, 518, 380 N.E.2d 423), or it may accept one expert's opinion over another so as to resolve contradictions (*People v. Clark* (1981), 102 Ill. App. 3d 414, 421, 429 N.E.2d 1255).

Defendant's treating and examining physicians all believed that he was suffering from schizophrenia, a mental disease, and Doctors Goldman and Silverstein testified that defendant was unable to distinguish right from wrong or to conform his conduct to the requirements of law at the time of the offense. Defendant had an extensive history of severe mental illness, including over 36 hospitalizations and, at the time of the offense, was being treated with Prolixin, an antipsychotic medication. According to the defense, the stabbing occurred during a schizophrenic episode, precipitated by defendant's frustration and the delusion that Degan had threatened him. Defendant felt upset and heard voices; his actions were chaotic and violent; he lost all sense of time. Defendant had a history of such episodes.

The evidence refutes the State's argument that defendant's acts were a result of drug-induced psychosis, caused by the ingestion of street drugs. The State's witness, Dr. Baron, based his opinion on defendant's prior drug abuse, his quick remission after the offense and his complaints of insomnia, irritability, poor appetite and vomiting, which are symptoms of drug use. Dr. Baron agreed that these are also symptoms of schizophrenia and did not examine defendant for needle marks or other signs of current drug use and no tests were made to detect the presence of drugs in defendant's system. Defendant denied having used drugs at the time of the offense and the police who arrested him did not believe he was under the influence of alcohol or drugs.

It appears in this case there was no real evidentiary conflict for the jury to resolve, because the testimony of the lay witnesses corroborated the defense experts' conclusions and Dr. Baron's testimony was weak and self-contradictory. Dr. Baron believed that defendant was faking, but he refused to rule out a diagnosis of schizophrenia and agreed that a quick remission was not inconsistent with schizophrenia. He believed defendant had the ability to conform his conduct to the requirements of the law, but he was unsure whether defendant had impulse control. Dr. Baron also speculated that defendant's behavior might only be part of a personality pattern. However, he also stated that Prolixin would not be prescribed for such a person and he agreed with the defense experts that defendant was "grossly psychotic" at the time of the offense. Dr. Baron also relied on defend-

ant's statements to the police and to the doctors that defendant knew he had done wrong. But these admissions were explained away by Dr. Goldman, who testified that a schizophrenic may have lucid moments and may even act remorseful after a psychotic episode. Dr. Baron agreed that defendant's schizophrenia might not be readily apparent to the police.

Although the trier of fact may believe the testimony of one witness over others, that witness must be credible in his diagnosis. (*People v. Muskgrove* (1976), 44 Ill. App. 3d 381, 386, 358 N.E.2d 336.) The fact finder can also reject all expert testimony and rely on lay testimony in concluding a defendant was sane. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 226, 448 N.E.2d 969.) Here, the State's witness was not credible, and the defendant's awareness of the wrongfulness of his conduct was not convincing. (See *People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388; *People v. Banks* (1974), 17 Ill. App. 3d 746, 308 N.E.2d 261; *People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415.) The present case must also be distinguished from those cases wherein a defendant had no prior history of mental illness. (*People v. Lane* (1974), 23 Ill. App. 3d 287, 319 N.E.2d 90; *People v. Stack* (1984), 128 Ill. App. 3d 611, 470 N.E.2d 1252.) If the testimony of the State's witness can be regarded as unreliable, it can be said the State failed to refute the evidence of defendant's insanity. See *People v. Arndt* (1980), 86 Ill. App. 3d 744, 408 N.E.2d 757.

We conclude that a reasonable doubt remains as to defendant's sanity at the time of the offense requiring reversal and need not consider other contentions of error raised by him.

Accordingly, the judgment of the circuit court is reversed and the cause remanded for entry of a judgment of not guilty by reason of insanity. The trial court is then directed to proceed in accordance with section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—4), which controls such dispositions.

Reversed and remanded with directions.

REINHARD and UNVERZAGT, JJ., concur.