THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOYCE ECKHARDT, Defendant-Appellant.

Second District No. 2—85—0921

Opinion filed June 26, 1987.—Rehearing denied July 24, 1987.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

1080

Philip L. DiMarzio, State's Attorney, of Sycamore (William L. Browers and Cynthia N. Schneider, both of State's Attorney Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Joyce Eckhardt, appeals for the second time her conviction for the murder of her husband, Harold (Vern) Eckhardt. Her first appeal resulted in reversal and remand for a new trial when we determined the prosecutor's misstatement of law regarding the insanity defense during closing argument was plain error which deprived her of a fair trial. *People v. Eckhardt* (1984), 124 Ill. App. 3d 1041.

On retrial, she waived her right to a jury and again raised the defense of insanity. As in her first trial, the sanity issue was heatedly contested. Substantial lay and expert testimony was presented on both sides of the issue. She contends here the State failed to meet its burden of proving her sane beyond a reasonable doubt.

■ At the outset, we note that prior to certain 1984 amendments to the Criminal Code of 1961 (the Code), when a defendant introduced evidence of insanity, the State was required to prove the defendant's sanity beyond a reasonable doubt in addition to the elements of the offense. (Ill. Rev. Stat. 1981, ch. 38, pars. 6—2, 3—2.) On January 1, 1984, Public Act 83—288 added section 6—2(e) to the Code and amended section 3—2(b). (Ill. Rev. Stat. 1985, ch. 38, pars. 6—2(e), 3—2(b).) These sections place the burden of proof upon a defendant, when the defense of insanity has been presented during trial, to prove by a preponderance of the evidence he is not guilty by reason of insanity. Although the retrial of the defendant here occurred after January 1, 1984, it has been held that a shift in the burden of proof relating to the insanity defense would be an *ex post facto* application of the statute if applied to a trial for an offense which was committed prior to the amendment to the law. (*People v. Hickman* (1986), 143 Ill. App. 3d 195, 198; *People v. Hollins* (1985), 136 Ill. App. 3d 1, 4-5; see also *People v. Palmer* (1985), 139 Ill. App. 3d 966, 972.) Consequently, in contrast to current practice, the State here bore the burden of proving the defendant sane beyond a reasonable doubt at her retrial.

Testimony adduced at the four-day bench trial showed that the defendant and Vern Eckhardt had been married for 18 years. They lived in a trailer park in Kirkland, Illinois, and had three children: Janelle, age 18; Julie, age 15; and Christopher, age 7. Vern worked as a process server for the De Kalb County sheriff's department.

A short time before Vern's death, the defendant had expressed some fear of her husband and also suspected that he might be involved with someone else, although she apparently did not express this latter suspicion to anyone. None of the witnesses at trial were aware of any threats the decedent had made toward the defendant or his family, nor were any of them aware of marital problems between the defendant and her husband.

At 2:45 a.m. on March 29, 1982, Christine Patten, a communications deputy with the De Kalb County sheriff's office, received a telephone call from the defendant. She asked that an officer be sent to her home in Kirkland because she had just shot her husband in the head; her tone of voice at the time was calm and unemotional.

Upon being advised of the defendant's phone call, Mary Mackler, another De Kalb County deputy, called her back. After one or two rings, the defendant answered the phone. Mackler engaged in the following conversation with the defendant:

"Mackler: Hello, Joyce?
Defendant: Yes.
Mackler: This is Mary from County. How are you?
Defendant: I'm okay.
Mackler: Is Harold there?
Defendant: Yes he is. He's in the bedroom.
Mackler: Is he alright?
Defendant: No. I just shot him.
Mackler: Well, did you check to see if there was a pulse?
Defendant: No, I don't want to go back in there, because I want to think he had a heart attack. I wanted to get him before he got me."

When Mackler asked the defendant whether she had told the children what happened, she responded that she had told them he had a heart attack; she would not let Mackler speak to any of the children. Mackler ended her phone conversation with defendant upon the arrival of De Kalb County Officer Joe Arundel at the defendant's home.

A number of other De Kalb County officers also arrived at the defendant's home. Vern Eckhardt was found lying face down in bed, dead from an apparent gunshot wound to his head. David Munch, an investigating officer, spoke with the defendant upon arrival. He advised the defendant of her *Miranda* rights, and she indicated that she wanted the children taken out of the house before talking to him. Thereafter, Munch asked the defendant, "What's been going on?" She responded, "It's been going on for a long time."

The defendant told Munch where the gun she had used was lo-

cated. It was found in a cabinet underneath the bathroom sink, lying on top of a number of items, and the holster was found on the countertop near the sink. The gun contained one empty shell casing and five live rounds. An autopsy performed on March 29 confirmed that Vern Eckhardt died from a bullet wound to the head.

The defendant gave a statement to Detective Gary Yeiser later that day. During the interview, she said several times that "Vern was going to hurt us," giving as her reason that he had worn his guns on Saturday around the house. On that day, March 27, Vern received a call informing him that his new gun grips were ready, and he left the trailer. Afraid that Vern was going to harm her and the children, the defendant barricaded the door and would not let him back into the trailer when he returned a few minutes later after having gone uptown. She also had called the sheriff's department to inform them of Vern's behavior. In her statement to Yeiser, she said Vern told her she better let him in the trailer or he would kill her or put her back in the "psych ward."

The defendant told Yeiser that on the following day, March 28, Vern was still attempting to straighten out the problem they were having, and that the children and she went shopping for shoes for the kids. Later, the defendant thought that Vern was upset with their daughters and that he might start yelling or throwing things, and she put Chris to bed so he would not get on Vern's nerves. Vern went to bed before the defendant. She could not sleep; she was upset and didn't know what she was going to do, but she felt something had to be done. She sat around for a while, thinking, trying to plan some course of action. She then went to bed.

Sometime later, early in the morning of March 29, she got out of bed, turned on the gas in the house, blew out the pilot lights, and then went back to bed. She then told Yeiser that she decided she didn't want to kill herself and the kids, so she thought some more and decided that she would kill Vern. She turned off the gas, and she found the key to the small cabinet next to their bed where Vern kept his guns. She opened the cabinet and removed a gun. She took it to the bathroom where there was light to see if it was loaded. It was, so she walked back into the bedroom, put the gun to the right side of Vern's head and pulled the trigger.

Yeiser said that during her statement, the defendant told him the last time she was in the hospital was about the time her son, Chris, was born, but she also told him about the time Vern was supposed to go to civil process school with Sharon Miller and another person from the sheriff's office in October 1981. She told him that she had gone

into the hospital in an attempt to keep Vern home with the family; she didn't want him to leave. She told Yeiser that when Vern tried to talk to her about divorce or separation, she did not respond. She also did not feel that she was being helped during her stays at the psych ward and that she would not be going back there. She further mentioned to Yeiser that about a week prior to the shooting, Vern had turned on the gas in the stove and had blown out the pilot light.

She told Yeiser that Vern talked about a divorce and about taking the kids away. She also told him that she had to kill Vern before he killed her; she could not give a reason for this belief. When asked why she was afraid of him, she referred to his wearing the gun and his asking her about a separation or divorce. She was afraid he was going to use the gun on her or the kids. When questioned whether she knew that what she had done to Vern was wrong, she said she did not think it was wrong because she did not have a choice.

De Kalb County sheriff's office Lieutenant Roger Davis went to see the defendant in her cell on April 15, 1982, at her request. She told him that she had a letter she had written which she wanted him to read as Vern's friend and handed him some papers. She told him she did not mind if he made copies of it or showed it to the sheriff.

Davis subsequently made a copy of the letter, which was admitted at trial as people's exhibit No. 19 and defendant's exhibit No. 1. In the letter, the defendant set forth various threats allegedly made by the decedent, recounted the circumstances leading up to the shooting, and expressed concern about her marriage and the possibility that the decedent had someone else in his life.

Several jail logs detailing the activity in the jail during the defendant's stay then were read to the court by Lt. Davis and De Kalb County sheriff's office Deputy Joanne Laben as part of the defendant's case. The logs revealed that on March 29, 1982, at 6:45 a.m. the deputy on duty, Dora Casurella, was informed by Detective Yeiser that the defendant was a possible suicide risk. At 9:30 a.m. that same day, the defendant told Deputy Flo Johnson that she had tried to set the mattress on fire, but that it would not burn. The defendant then said, "I don't know why I shot Vern; I love him." She added, "I didn't mean to do it. When I get out of here, I'm going to kill myself. I have nothing to live for." She then complained of chest pains, for which she was given Tylenol. Shortly thereafter, Deputies Johnson and Davis went to the defendant's cell, because they smelled something burning. They found her standing at the mirror burning her hair with matches; one-inch flames were burning her hair. She then collapsed and her arms went limp. Deputy Johnson remained with her

until Dr. Wassner, the jail doctor, arrived. The defendant was then placed in a holding cell where she could more easily be observed.

Sharon Miller, a De Kalb County sheriff's deputy who worked closely with Vern, saw the defendant in her cell on the afternoon of March 29. At that time, the defendant was lying on the floor of the cell in a fetal position, although there was a bunk in the cell. Miller spoke to the defendant for about 15 to 20 minutes and persuaded her to change out of her jail uniform and go to court.

On March 30, frequent checks were ordered of the defendant, one every 5 to 10 minutes. Her subsequent behavior, as recorded in the jail logs, revealed she fluctuated between periods of depression and hostility. On April 1, Dr. Wassner advised jail personnel to be sure defendant took her medication, because she was psychotic. Two days later, the defendant attempted to slit her wrists with a pencil. She told Deputy Miller that she "just wanted to die." She then started to slide down the bars, but Deputies Miller and Munch held her up and led her to a table. She kept telling the deputies that no one really loved her, and that she should just kill herself. The defendant admitted to Deputy Joanne Laben that when she said she had broken her glasses the other day by dropping them, she had actually tried to remove the lenses.

On April 8, the defendant informed the deputies that she wanted to waive her rights and "blab everything." She was then read her *Miranda* warnings from a card. Deputy Laben testified that she listened to the defendant for a few minutes, but that she just "talked in circles." Deputy Laben was not authorized to ask the defendant any questions; therefore, she concluded the interview.

The defendant was placed twice in the padded cell at the jail due to her disruptive behavior. She pounded on the bars for long periods of time, as well as on the glass on the padded cell door. The monitor inside the padded cell recorded the defendant talking to herself, repeatedly buttoning and unbuttoning her uniform and pacing. On April 26 the defendant remained nude most of the day, refusing to get dressed until 5:35 p.m. She became angry with the deputy two days later, when her daughter Julie came to visit her, stating, "I don't appreciate you giving my daughter a dirty look."

After rattling the bars of her cell most of the day May 5, the defendant started a fire in her cell at 9:40 p.m. She also asked Deputy Munch for a .357 gun so that she could shoot one of the other deputies in the back.

Various of defendant's and decedent's family members and defendant's co-workers testified to the change in the defendant's per-

sonality which occurred after she underwent thyroid surgery in November 1976. Among such witnesses was Pearl Sturgis, the defendant's mother. She testified that the defendant was very quiet and well behaved as a child; she was also quiet as an adult. After the defendant underwent thyroid surgery, she became hostile, nervous and afraid of unknown things and of dying. She also began pacing a lot. Within two or three years prior to the shooting, the defendant began calling her mother "Pearl," something she had never done before, and she expressed hostility toward her, suggesting that her mother should be institutionalized and that she was not really her mother. The defendant's housekeeping also became very sloppy and messy sometime in the fall of 1981, which was also unusual for her. She began posting on the refrigerator and bulletin board, and kitchen and living room wall, numerous magazine cut-outs containing various thoughts or poems about life, happiness, and religion.

On October 19, 1981, Pearl Sturgis received a telephone call at work advising her that the defendant had barricaded herself in the trailer with her children and would not open the door or let anyone inside. Although she telephoned her daughter and tried to speak with her, the defendant hung up on her. The defendant also made her daughter, Janelle, hang up the phone when Pearl Sturgis called back.

The defendant eventually let her sister, Ellen Carlson, inside the trailer and later let in her brother and her husband. She refused to go to the hospital and refused to talk to anyone, turning on the radio and placing her hands over her ears so she could not hear them. She then put on Vern's police hat and coat, walked out the door and announced they were going to the "psych ward." The defendant's brother, Norris Palmer, took her to Kishwaukee Hospital later that evening, where she was involuntarily admitted to the psychiatric ward. She signed herself into the hospital the following day.

Pearl Sturgis further testified that she saw her daughter in court after the shooting. The defendant's hair was singed where she had burnt it and her eyes were black as though she had not slept in a week. The defendant sat expressionless in court with her eyes closed. She refused to open her eyes at her mother's request, stating, "You don't want to see me now, I did what Vern wanted me to do." The defendant did not speak to the judge; she nodded her head in response to questions.

Pearl Sturgis stated she did not know if Vern was having an affair, but that she did not believe so since he worked five days as a sheriff's deputy, two nights at a second job, bowled one night in a men's league, and one night with the defendant in a mixed league.

Janelle Eckhardt, the defendant's daughter, testified she was 16 in 1982. On March 25, 1982, the Thursday before her father was shot, her mother came to school in the morning to pick up her and her sister. She told the children that their great-grandmother had died, which turned out to be false, and that they were going to drive to Geneva to tell their grandmother. The defendant drove through Geneva to Rochelle, at which time the children started crying and became frightened, so she drove home. When Janelle asked what was wrong, the defendant said she was trying to get away from Vern's mother and that she was afraid and upset.

Janelle testified that her mother woke her up about 2:30 a.m. on March 29 and told her that her father had suffered a heart attack; the defendant appeared to be calm at the time and was not crying. She also began pacing the kitchen floor. Janelle further testified that there was a pattern in her mother's behavior. After each of her psychiatric hospitalizations, she would be all right for a couple of weeks, and then she would fall back into pacing back and forth and crying, keeping herself in her room. Also, prior to her mother's last hospitalization in October 1981 she would ask the children to read the little sayings she had hung up in the kitchen and to stand in a circle and hug each other, unusual behavior for her mother. The defendant also took one of Janelle's posters out of her room and put it in her own. It read, "I finally got everything together but I forgot where I put it."

Dorothy Eckhardt, Vern's mother, testified on the defendant's behalf. She testified that after the defendant's operation in 1976, she became even quieter and would hide in her bedroom or the bathroom when family would visit. The defendant would cry for no apparent reason, and her tongue was constantly "running around her mouth." She had the opportunity to see the defendant every day because she picked up their mail in town and delivered it on her way home. Also, she would baby-sit for the kids when the defendant and Vern went out bowling. She would wash the dishes that were left after meals; sometimes she found dishes hidden in the oven. The two women usually did their laundry together. On one occasion, the defendant drove over to pick her up to do the laundry, but then drove off and called her, saying that Dorothy was hurting her children.

On March 21, 1982, the Sunday before Vern's death, the family had a birthday party for the defendant and Vern's son, Chris. The defendant seemed skittery, but she fixed dinner and played on the floor with a toy race car. The next night when she took their mail over, Dorothy made a comment about an acrobatics show that was on television, stating, "That would kill me if somebody did that to me."

When she got home, the defendant called her up and said, "I heard you tell my kids it would kill you if you had to live with me." When Dorothy asked her what the matter was, the defendant replied, "Stick it in your ear," and hung up. Dorothy stated that during this period the defendant would often misinterpret what she and other family members said to her.

The defendant avoided seeing Dorothy for three days after this incident, and then the Friday before Vern's death, the defendant came over to Dorothy's trailer and hugged her, saying she did not know what was wrong with her. The defendant also told Dorothy she had taken the children out of school and had driven "all over" but had no place to go so she came home. She later said she was looking for an abused wives' shelter. None of the witnesses at trial ever heard of Vern's being abusive toward the defendant, or saw any marks on her. When Dorothy left the defendant on Friday, her tongue was still "running around her mouth," and she was twitching her hands and beginning to pace.

Dorothy Eckhardt testified that when the defendant barricaded Vern out of the trailer on March 27, he called the defendant and begged to let him help her stating: "I love you, girl" and "Please let me come and help you." Vern did not gain entrance to the trailer until about 8 p.m., four or five hours later.

Dr. Thomas Kirts, a psychiatrist who had been treating the defendant since her thyroid surgery in 1976, testified to various psychiatric hospitalizations of the defendant commencing in December 1976. The defendant was admitted to Kishwaukee Hospital as a psychiatric patient on December 12, 1976, suffering from severe depressive neurosis, and was released on December 17, 1976. She was hospitalized the following year from November 4 to November 7, 1977, and from January 17 to January 24, 1979, again suffering from depressive neurosis, but with no apparent delusions or hallucinations. Upon each discharge and during periodic examinations between her hospitalizations, the defendant seemed to be doing fine. For the most part, Dr. Kirts prescribed Pertofrane, an antidepressant, for the defendant. On occasion during the course of her treatment, he also prescribed Stelazine, an antipsychotic medication, Artrane to block the side effects, Mellaril, a sedative, and sleeping pills depending on her needs.

On October 2, 1981, the defendant visited Dr. Kirts and was very depressed. This was the day after the defendant learned from Sharon Miller that Vern was scheduled to go to civil process school. She returned to Dr. Kirts later that day and was admitted to the hospital, remaining until October 9. Dr. Kirts' diagnosis at that time was major

depressive disorder, a more serious disorder than depressive neurosis. Dr. Kirts also believed the defendant had passive suicidal wishes, in that she began wishing she was dead.

The defendant was involuntarily committed on October 19, 1981, after the barricading incident. Dr. Kirts found her to be very depressed and also noted for the first time that she was suspicious toward family members. During this hospitalization, she clung to the staff and patients in the hospital, appeared to be confused, and talked to God. As a result, she was put into seclusion. The doctor diagnosed her condition on that date as major depressive disorder with psychotic features, adding the latter diagnosis because of the defendant's feeling that someone was going to hurt her.

Later, because she was doing better while on her medication, she was given a four-hour pass to leave the hospital on October 30, 1981; however, she did not return, and she was discharged against medical advice. She had improved rapidly during her hospitalization, and she seemed to be doing well in her three later visits to Dr. Kirts at the clinic. Dr. Kirts last saw her on February 2, 1982, and directed her to return for a periodic examination in eight weeks.

After the shooting of Harold Eckhardt on March 29, Dr. Kirts examined the defendant on May 11, 13 and 17, 1982, by court order, to determine her state of mind at the time of the shooting. He believed that at the time of the offense, the defendant was delusional and suffering from a schizo-affective disorder. Although he believed the defendant could appreciate the criminality of her acts on March 29, it was his opinion that as a result of the aforementioned mental disease she could not conform her conduct to the requirements of the law.

Dr. Robert Wettstein, a psychiatrist who examined the defendant on five occasions for about a total of seven hours between February 18 and March 18, 1983, agreed that the defendant was suffering from a schizo-affective disorder on March 29, 1982, at 2:45 a.m., a condition which caused significant thought, mood and behavior disturbances. He was unable to say with any certainty whether the defendant could appreciate the criminality of her acts on that date, but was of the opinion that she could not conform her conduct to the requirements of the law.

In rebuttal, the State presented the testimony of Dr. Werner Tuteur. Dr. Tuteur examined the defendant on April 17, 1982, shortly after the offense, for 1½ hours, and he examined her again on October 10, 1982, for 40 minutes. Dr. Tuteur believed that on March 29, 1982, the defendant suffered from a borderline personality disorder which is common in the general population, in that she suffered from moods

and depression. Dr. Tuteur concluded that the defendant did not have a mental disease because she exhibited intent and knowledge at the time in question; she did not experience delusions. It was his opinion that the defendant, in the absence of a mental disease, was able to appreciate the criminality of her act, and that she was capable of living up to the requirements of the law. He also opined that if the defendant had a mental disease, she could still conform her conduct to the requirements of the law.

Various De Kalb County officers who observed the defendant at her home and in the jail after the shooting also testified in rebuttal to their opinion that the defendant was able to appreciate the criminality of her act or conform her conduct to the requirements of the law. Several of these officers had been acquainted with the defendant and her husband for periods ranging from 6 to 18 years. Additionally, Mark Thurlby, a member of the Kirkland rescue squad, testified that he was the first person to arrive on the scene on March 29, at approximately 3 a.m. The defendant commented to him at that time, "He had a heart attack, that's all, a heart attack." Thurlby stated there was a different atmosphere there in contrast to other emergency calls they get for heart attack victims in that the defendant appeared to be so calm.

At the close of the trial, the court found the defendant guilty but mentally ill of the offense charged, and she was later sentenced to a 20-year term of imprisonment.

The defendant argues the State's evidence failed to prove that she was sane beyond a reasonable doubt. She characterizes the rebuttal testimony of Dr. Tuteur as contradictory and biased and asserts that the testimony of the State's lay witnesses was inconclusive. She contrasts this with the evidence she presented by way of the testimony of both a treating and examining psychiatrist, family members, and co-workers which was supportive of her insanity defense.

 As defendant notes, the insanity defense reflects the fundamental principle that a person is not criminally responsible for an involuntary act. (*People v. Clark* (1981), 102 Ill. App. 3d 414.) The law presumes all persons to be sane (*People v. Dunigan* (1981), 96 Ill. App. 3d 799; *People v. Dominique* (1980), 86 Ill. App. 3d 794), but a defendant may overcome that presumption by presenting some evidence to raise a reasonable doubt of his or her sanity, and when such defense has been raised, the presumption no longer prevails and the State must prove beyond a reasonable doubt that the defendant was sane at the time of the alleged offense. (*People v. Jones* (1982), 109 Ill. App. 3d 120.) Insanity of a person either before or after the com-

1090

mission of a crime cannot excuse the crime; only insanity existing at the very time of the crime can excuse it. (*People v. Smith* (1984), 124 Ill. App. 3d 243, 250; *People v. Dunigan* (1981), 96 Ill. App. 3d 799, 820.) An accused who understood the nature of his or her conduct and appreciated its wrongfulness will still be excused from criminal liability if his or her ability to consciously refrain from that conduct was substantially impaired by a mental disease or defect. *People v. Teague* (1982), 108 Ill. App. 3d 891, *cert. denied* (1983), 464 U.S. 867, 78 L. Ed. 2d 179, 104 S. Ct. 206.

 In order to sustain its burden of proof on the issue of sanity, the State must prove either (a) that the defendant was not suffering from a mental illness, or (b) that the defendant did not lack the capacity to conform his or her conduct to the requirements of the law, as a result of such disease, at the time the offense was committed. (*People v. Gurga* (1986), 150 Ill. App. 3d 158, 163; Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).) In deciding whether the State has proved the defendant sane beyond a reasonable doubt, the trier of fact must consider the totality of the evidence, weighing testimony and determining credibility of witnesses, both expert and lay, without being required by law to accept the opinions of psychiatrists regarding sanity. (*People v. Clark* (1981), 102 Ill. App. 3d 414.) The trial judge is not obligated to accept the opinions of psychiatrists proffered by the defendant, but is entitled to consider contrary opinions of the State's expert witness. (*People v. Rennert* (1977), 49 Ill. App. 3d 485.) The resolution of contradictory testimony by experts in the determination of whether the defendant was legally sane at the time of the crime and the determination of its weight and credibility are for the trier of fact. (*People v. Schwartz* (1985), 135 Ill. App. 3d 629, 642; *People v. Meeker* (1980), 86 Ill. App. 3d 162.) The trier of fact's finding on the issue of the defendant's sanity at the time of the crime will not be reversed unless it is so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's sanity (*People v. Gurga* (1986), 150 Ill. App. 3d 158; *People v. Schwartz* (1985), 135 Ill. App. 3d 629; *People v. Taylor* (1982), 110 Ill. App. 3d 112) or so palpably erroneous as to indicate it was based on prejudice or passion. *People v. Johnson* (1981), 101 Ill. App. 3d 1060; *People v. Childers* (1981), 94 Ill. App. 3d 104, *cert denied* (1982), 455 U.S. 947, 71 L. Ed. 2d 661, 102 S. Ct. 1448.

Defendant contends that an examination of the methods and bases utilized by the three doctors in arriving at their opinions reveals the reasons for the conflict and their attendant weaknesses which prevented the State from meeting its burden. Specifically, she asserts that the methodology and bases for the opinions of her expert wit-

nesses, Drs. Kirts and Wettstein, firmly support their conclusion that at the time of the offense she suffered from a schizo-affective disorder, a psychosis which prevented her from conforming her conduct to the requirements of the law.

■■ She points to the substantial length of time Dr. Kirts had treated her prior to the offense and his three interviews with her in May 1982 after the shooting. Further, she points out his diagnosis was consistent with that of Dr. Wassner at the De Kalb County jail, who advised the deputies that the defendant was "psychotic and suicidal." It was also consistent with the diagnosis and treatment of her at Singer Zone Mental Health Center, where she was hospitalized pending her fitness to stand trial, and at Dwight Correctional Center, where she was incarcerated after trial. We point out, however, as the State notes, that the assessments of the defendant's mental condition from these three sources were not supported by testimony. Thus, they are inadmissible for the truth of such assessments and may be considered only to the extent they formed a basis for the opinions of the testifying doctors. *People v. Anderson* (1986), 113 Ill. 2d 1, 11-12.

Dr. Kirts testified the treatment the defendant received from him and at Singer and Dwight is not the type of treatment that would be given a person who had a borderline personality disorder. He also found the defendant's behavior during the week preceding the shooting was indicative of a delusional mind, *i. e.*, the defendant believed Vern was dangerous or was likely to kill her and the children.

She asserts Dr. Wettstein also examined her in detail in February and March 1983 for a total of more than seven hours. He examined her with regard to her lifelong psychiatric history, which included consideration of social, interpersonal and economic factors. He performed a mental status examination, which is an observation of the patient along with asking some specific questions. It included observation of her attention and concentration, thinking, perception, speech, language, motor function, physical activity, mood and affect. Dr. Wettstein also administered the Minnesota Multiphasic Personality Inventory, which he felt validated his clinical impression that she was not malingering, that is, putting on a pretense of psychiatric illness. He interviewed her daughters, reviewed police reports of the incident, her psychiatric records dating from 1976, and the evaluations done by Drs. Kirts and Tuteur.

Dr. Wettstein acknowledged it is possible that competent psychiatrists from time to time can arrive at different opinions based on similar facts. One technique for validating an opinion is to look at the opinions of other psychiatrists to see if they agree with your own, and

another is to see how a person is responding to treatment.

Based on his investigation, it was his opinion that the defendant was suffering from a schizo-affective disorder on March 29, 1982, and that she could not conform her conduct to the requirements of the law. His opinion was based particularly on what he considered to be her delusional thinking with regard to her husband. In determining her thoughts were delusional, he tried to determine from various sources (her family, her records, other psychiatrists who had interviewed her) whether there was any corresponding truth to the defendant's beliefs. He testified it was not unusual for the defendant to have "ups and downs," as her illness was a chronic and recurring one. Further, he stated it was possible to have a personality disorder as well as another mental illness such as psychosis or depression or schizophrenia. Dr. Wettstein testified that after looking at not only the medication the defendant received, but also at the dosages, the duration and the success of the treatment, he felt that such a course of medication given to a person with a personality disorder would have had serious side effects, which was not the case with the defendant as far as the reports indicated to him.

In contrast to the testimony of her expert witnesses, the defendant points to the methodology whereby Dr. Tuteur reached the opinion that she was suffering from a borderline personality disorder, which is not a psychosis. His opinion was based on two interviews of less than two hours' time with her in April and October 1982. He stated he would not treat a person with a major depressive disorder, severe, recurrent, with Pertofrane, Stelazine, or Mellaril; rather, he still treats such patients with electroshock. He stated he would not have treated the defendant with electroshock. He testified the treatment for a borderline personality disorder depends on the patient due to the varying symptomatology of such an illness, and a person with a borderline personality disorder could be treated with Pertofrane if he or she were depressed. He could not comment on the propriety of treating a borderline personality disorder with Pertofrane in high dosages over a long period of time. He testified he never had the need to follow a course of frequent antidepressants, and stated that less Pertofrane would be needed if the therapist were stronger in giving psychotherapy to the depressed person.

Although Dr. Tuteur found the defendant's behavior before and after the shooting was "interesting," he did not consider it important or relevant with regard to her mental state at the time of the incident. What he found relevant was that at the time of the incident, she was in control of her faculties. Although he would not exclude from

consideration her psychiatric history, the other doctors' opinions, or her treatment at Singer and Dwight, he nevertheless believed her mental illness was not present at the time of the crime.

Dr. Tuteur testified he considered it important that the defendant was not exhibiting any signs of a major depressive disorder, severe, recurrent, at the times he examined her. Although he did not know or ask her whether she was on medication which could have affected what she said at the time he interviewed her, Dr. Tuteur stated his opinion regarding her sanity would not change if he learned she was taking medication at either or both of the interviews. It was his opinion that the defendant was not delusional since she did not argue with him when he confronted her with her alleged beliefs with regard to her husband. He defined a delusion as "a fixed false belief with which one cannot argue." Thus, when he suggested to her that her beliefs were merely suspicions and she agreed, he concluded she was not delusional.

Defendant denigrates Dr. Tuteur's analysis of her mental condition on the basis he afforded little, if any, relevance to her behavior prior or subsequent to the offense. She asserts a defendant's condition before and after the offense has been found to be relevant to the question of sanity in *People v. Haun* (1966), 71 Ill. App. 2d 262, *People v. Vanda* (1982), 111 Ill. App. 3d 551, and *People v. Buggs* (1986), 112 Ill. 2d 284. Each of those cases, however, concerned whether certain evidence of a defendant's behavior before and/or after an offense had been either improperly excluded or properly admitted. In each instance, the court deciding the case adhered to the view that almost every aspect in a defendant's life is relevant when the defense of insanity is raised. (*People v. Buggs* (1986), 112 Ill. 2d 284, 290; *People v. Vanda* (1982), 111 Ill. App. 3d 551, 556; *People v. Haun* (1966), 71 Ill. App. 2d 262, 268.) "Within reasonable time limits, every act in a defendant's life is relevant to the inquiry regarding his sanity [citation], including events that occurred both prior to and subsequent to the crime committed by the defendant. [Citation.]" *People v. Vanda* (1982), 111 Ill. App. 3d 551, 556.

 No question is presented here, however, regarding the improper admission or exclusion of evidence, and we do not view these cases as establishing a requirement that a psychiatrist must consider such evidence in making a diagnosis. A psychiatrist is entitled to determine what information he or she regards as relevant in reaching a diagnosis, and the methodology used by the psychiatrist is, therefore, one factor the trier of fact may take into account in weighing the psychiatrist's opinion. Dr. Tuteur's emphasis on the defendant's condition

at the time of the offense, rather than before or after it, comports fully with established Illinois law that only insanity existing at the very time of the crime, and not before or after, can serve as an excuse. (*People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 827; *People v. Smith* (1984), 124 Ill. App. 3d 243, 250.) Further, there is no legal minimum time for interviewing a defendant before a psychiatric diagnosis may be made. In fact, it has been held that a psychiatrist testifying at trial need never have interviewed a defendant in order to develop an opinion as to the defendant's sanity at the time of the commission of the crime. *People v. Newbury* (1972), 53 Ill. 2d 228, 236; *People v. Smith* (1981), 93 Ill. App. 3d 26, 34.

The defendant challenges Dr. Tuteur's opinion that she was not delusional since it was based strictly on the fact that she did not argue with him when he suggested to her that her beliefs concerning her husband were only suspicions. She points to Dr. Wettstein's testimony that the presence of an argument isn't an essential part of the definition; rather, it is just that the person will not relinquish the belief. The record shows, however, that Dr. Wettstein and Dr. Tuteur each recognized the definition of "delusion" provided in DSM-III, a diagnosis manual approved by the American Psychiatric Association, to wit:

> "A delusion is a false, personal belief based on incorrect inference about external reality and firmly sustained in spite of what almost everyone else believes and in spite of what constitutes uncontroverted and obvious proof of evidence to the contrary. The belief is not ordinarily accepted by other members of the person's culture or subculture. That means it is not an article of religious faith."

Dr. Tuteur explained that that definition is "generally basic," and that although he fully agreed with it, he "always put[s] it a little stronger"; *i.e.*, "a fixed false belief with which one cannot argue." Dr. Tuteur noted at trial that in none of the material he reviewed before making his diagnosis was it reflected that the defendant's suspicions of her husband were ever argued with her, and when he confronted her with them, she did not disagree with him that they were suspicions. As the State points out, Dr. Tuteur's conclusion that defendant was not delusional is supported in the record by people's exhibit No. 19/defendant's exhibit No. 1, the letter that defendant wrote and gave to Lt. Davis to read. Therein, she expresses several of her alleged "fixed beliefs" in tentative phrasing and acknowledges that she "think[s]" there might be someone else in his life, but that she didn't have any proof.

She next argues Dr. Teuter "transcended his role as a witness and actively pursued a guilty verdict," citing one instance wherein he attempted to amplify on the rationale underlying his conclusion that she did not lack substantial capacity due to mental disease to conform to the requirements of the law. There was no question pending, the defendant objected to the Doctor's narrative, and the court overruled the objection, allowing the volunteered explanation to remain. Defendant cites no authority, however, which would support reversal for such an occurrence. Moreover, we agree with the State that the explanation was volunteered by Dr. Teuter simply in elucidation of his professional opinion, and not for the purpose of bolstering the prosecution.

Defendant next asserts Dr. Tuteur impeached his own diagnosis that she did not have a mental disease when he hypothetically opined that if she did have a mental disease, it was not sufficient to prevent her from conforming her conduct. The record shows, however, that the doctor responded to this hypothetical posed by the prosecutor on redirect only after answering a preliminary question that a person could still have the ability to conform his conduct even while suffering from a mental disease. Prior to that, during cross-examination, he refused to respond to hypotheticals that the defendant was psychotic or delusional since he did not believe she was. We believe the totality of the doctor's testimony shows he was unequivocal in his opinion that she suffered from a borderline personality disorder which is very common in the general population and which is not considered a mental disease.

The weight to be given an expert's opinion is measured, in part, by the factual details supporting his conclusions. (*People v. Palmer* (1985), 139 Ill. App. 3d 966, 972; *People v. Martinez* (1980), 86 Ill. App. 3d 486, 491.) As noted above, the resolution of contradictory testimony by experts in the determination of whether a defendant was legally sane at the time of the crime and the determination of the weight and credibility of such contradictory testimony is for the trier of fact. *People v. Schwartz* (1985), 135 Ill. App. 3d 629, 642; *People v. Meeker* (1980), 86 Ill. App. 3d 162.

We do not find the court's judgment so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's sanity. In addition to other evidence in the record which supports the court's judgment, we note it has been found that one fact having particular relevance on the question of the sanity of an accused is the existence of a plan or design for the perpetration of the crime. (*People v. Clark* (1981), 102 Ill. App. 3d 414.) The evidence here showed the defendant spent some time thinking about what she was going to do,

and that she abandoned her first plan to turn on the gas and kill them all in favor of just killing Vern. Although she had no real plan to escape or conceal the crime (*cf. People v. Spears* (1978), 63 Ill. App. 3d 510, 519 (the existence of a plan for escape and prevention of detection or concealment of the crime is especially relevant to a defendant's sanity)), she only tried to hide her responsibility for the shooting from her children while telling the police that she wanted to "get him before he got her." *Cf. People v. Littlejohn* (1986), 144 Ill. App. 3d 813, 823 (where defendant remained at the scene and admitted committing the stabbings, stating, however, that "God made me do it.").

■■ ■ Defendant also challenges the credibility of the State's lay witnesses, several of whom had an opportunity to observe the defendant immediately after the shooting. In contrast with those witnesses, she points to several of her own witnesses who were related to her and who had a significant opportunity to observe her at close range on a frequent basis and under a variety of circumstances.

It has long been held that "a nonexpert witness who has had an opportunity to observe the subject under inquiry may give his opinion as to his mental condition—at the same time stating the facts and circumstances as the basis for the opinion." (*People v. Pruszewski* (1953), 414 Ill. 409, 413.) Whether a witness has testified to sufficient facts and circumstances supporting such an opinion is a matter within the trial court's discretion (*People v. Kuntz* (1977), 52 Ill. App. 3d 804), and the defendant here has not challenged the admissibility of the lay witnesses' opinions. Accordingly, the limitations attending each witness' opportunity to observe the defendant was something for the court as the trier of fact to consider in deciding how much weight to give the witness' opinion. *People v. Liberg* (1985), 138 Ill. App. 3d 986, 991.

■■ It has also been established that the fact finder may reject all expert testimony and rely on lay testimony in concluding the defendant was sane (*People v. Palmer* (1985), 139 Ill. App. 3d 966, 974), or the fact finder may accept part of each expert's testimony and reject other parts of the testimony. (*People v. Grice* (1984), 121 Ill. App. 3d 567, 569.) The court here could reasonably have afforded the State's witnesses' testimony more weight than that suggested by the defendant. Although the acquaintance of some of the State's witnesses with the defendant was obviously not as intimate as her interaction with her relatives, it nevertheless was of considerable duration, and the defendant's acquaintance with some of the witnesses was relatively direct and personal, such as bowling with them, having dinner with them, or socializing at each other's homes. The court reasonably

could have found the testimony of these witnesses to be supportive of Dr. Tuteur's opinion.

We find the instant cause distinguished from *People v. Arndt* (1980), 86 Ill. App. 3d 744, and *People v. Palmer* (1985), 139 Ill. App. 3d 966, upon which cases defendant relies for reversal.

In *Arndt*, the State introduced no expert or lay testimony to rebut the opinions of the defendant's experts. Further, it seemed to the court that the trial court did not question the credibility of the defendant's psychiatrists but, rather, that it drew different conclusions than they did. The record there contained such substantial, reputable evidence that the defendant lacked the ability to conform her conduct to the requirements of the law, which was uncontradicted by any evidence from the State, that the court found there existed a reasonable doubt of her sanity at the time of the homicide. *People v. Arndt* (1980), 86 Ill. App. 3d 744, 749-50.

In *Palmer*, the court found the State's expert's testimony in support of its position that the defendant's acts in the stabbing death of the victim were the result of a drug-induced psychosis did not rebut the defendant's experts' conclusions that he was suffering from schizophrenia at the time of the offense and could neither distinguish right from wrong nor conform his conduct to the requirements of the law. The court considered the State's expert's testimony was weak and self-contradictory where, although the doctor believed the defendant was faking, he would not rule out a diagnosis of schizophrenia. The doctor agreed with the defense experts that the defendant was "grossly psychotic" on the day of the stabbing, but he believed it was as a result of the ingestion of street drugs. The defendant denied taking any street drugs or alcohol at the time of the stabbing. The doctor felt the defendant was lying, though, since he had a history of drug abuse and he complained of symptoms indicative of drug use at the time of the offense. The doctor admitted such symptoms were also indicative of schizophrenia, however, and the doctor did not examine the defendant physically for needle marks or other signs of current drug usage, and no tests had been made to detect the presence of drugs in the defendant's system. The police who arrested the defendant did not believe he was under the influence of alcohol or drugs. In reversing and remanding for entry of a judgment of not guilty by reason of insanity, the court found no real evidentiary conflict for the jury to resolve, and it also considered that the testimony of the lay witnesses corroborated the defendant's experts' conclusions.

Here, the State's evidence did present a conflict to be resolved by the court as the trier of fact. Dr. Tuteur was firm in his

opinion that the defendant suffered from a personality disorder, not a schizo-affective disorder, that she was not delusional, and that she could appreciate the criminality of her act and conform her conduct to the requirements of the law. His opinion was supported by other evidence in the record, including evidence of the defendant's conduct at the time of the offense, and the testimony of the witnesses who observed the defendant on the day of the shooting.

Accordingly, we affirm the judgment of the circuit court of De Kalb County.

Judgment affirmed.

HOPF and INGLIS, JJ., concur.