2020 IL App (2d) 180341-U
No. 2-18-0341
Order filed September 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of DuPage County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02-CF-2346 |
| | ) | |
| ADAM P. PALINSKI, | ) | Honorable |
| | ) | Robert A. Miller, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's postconviction petition was not barred by 11-year delay in bringing petition after posttrial change in law allowed possibility of raising defense of involuntary intoxication, and defendant set forth sufficient evidence to warrant third-stage evidentiary hearing on his claim that he was involuntarily intoxicated by prescription drugs at the time he committed act that formed the basis of his conviction of solicitation of murder.

¶ 2                     I. INTRODUCTION

¶ 3   Defendant, Adam Palinksi, appeals the dismissal of his postconviction petition following the second-stage of postconviction proceedings. Defendant contends that he made a sufficient showing to support a defense of involuntary intoxication such that he is actually innocent of the charges of which he stands convicted. For the reasons that follow, we reverse and remand.

¶ 4                                    II. BACKGROUND

¶ 5      Defendant was convicted of setting fire to St. Michael's Church in Wheaton on March 18, 2002. Defendant also attempted to set fire to a neighbor's house on that same date. The day after the fire, Thomas Mottier contacted the police and informed them that defendant was responsible for the fire. Defendant was subsequently arrested and convicted of the offenses of arson and aggravated arson as a result.

¶ 6      In June 2002, while being held in the DuPage County jail, an inmate reported that defendant intended to have Mottier killed. Defendant was charged with solicitation of murder for hire. He interposed an entrapment defense. Ultimately, he was convicted of this offense and sentenced to 24 years' imprisonment. The facts of both the underlying arson and solicitation cases are set forth in our disposition on direct appeal, and we will not restate them in detail here. See *People v. Palinski*, Nos. 2-04-0082, 2-04-0084, and 2-04-0249 cons. (October 21, 2005). We will, however, summarize the events leading to defendant's conviction of solicitation of murder for hire.

¶ 7      Mottier testified that he had a conversation with defendant on March 18, 2002. Defendant told Mottier that he had set St. Michael's church on fire. The next day, Mottier contacted the police. On March 20, 2002, Mottier agreed to allow the police to tape record a conversation between him and defendant. Mottier's actions led to defendant's arrest.

¶ 8      Detective William Cooley testified that the police interviewed three inmates who had had contact with defendant in the DuPage County jail—Ray Garvin, Frank Saunders, and Sean Rosner. Cooley obtained a court authorization to conduct an overhear of defendant and record conversations pertaining to solicitation of murder for hire. Cooley was aware that a person named Kristie Karels was in contact with defendant. Karels was not acting as an agent of the police. Also, Jennifer Williams, defendant's ex-girlfriend, who was acting as an agent of law enforcement,

was in contact with defendant as well. Cooley was aware that defendant had made a false confession to a murder that had occurred in October of 2000 in Bartlett.

¶ 9    Rosner testified that defendant told him that he would like to have Mottier "taken care of or taken out." Saunders testified that defendant asked him if he would kill Mottier. Saunders replied that he would not.

¶ 10   Raymond Garvin testified that he agreed to wear a wire and record conversations he had with defendant. In one conversation, defendant stated that he wanted Mottier's throat slit. Garvin asked defendant if he wanted Garvin to contact a friend, who was a hitman. Defendant stated he would have to speak with his girlfriend about arranging for payment. Garvin told defendant that the hitman's name was Tony. On July 31, 2002, Garvin told defendant that Tony wanted $500 for the killing. Defendant told Garvin that his girlfriend had $350. Garvin later told defendant that he had spoken with Tony, and Tony would take $300, but wanted to know when he would get the rest of the money. Defendant gave Garvin Mottier's address and told him where Mottier worked. Defendant then said he would contact Karels and later told Garvin that Karels would have $350 by the following Friday. Garvin called Tony (actually Cooley) while defendant was present. Defendant stated that he would call Karels and arrange for her to get $500 to Tony the next day.

¶ 11   Karels testified that she became involved in a relationship with defendant after seeing a newspaper article about his case. They corresponded by letter and spoke on the telephone. A recorded telephone conversation between defendant and Karels was played for the jury. In it, defendant attempts to set up payment for Tony. At one point, he expresses surprise that Karels is considering helping him. Defendant also notes that he has been placed with "this guy" a few times (presumably Garvin) and that "it could be, like, a temptation from Satan." On August 10, 2002,

defendant and Karels spoke again. He asked her for $350 for Tony, and she stated she was not going to get involved.

¶ 12    Williams testified that she had dated defendant from January 2001 to October 2001. In August 2002, Williams was contacted by the DuPage County sheriff's department. She agreed to meet with defendant and speak with him about a matter that was not related to the instant case. She met with defendant on August 11, 2002, at the DuPage County jail. Defendant told her he had been betrayed by Mottier and was going to have him killed. She again met with defendant on August 14, agreeing to have the conversation recorded. He told Williams about the plan to pay Tony $350 to kill Mottier. However, defendant also expressed reservations about going forward with the plan. Ultimately, defendant stated he would talk to Garvin and arrange for Williams to meet Tony.

¶ 13    Detective Tony Davis testified that he spoke with defendant over the telephone, posing as the hitman "Tony." Defendant instructed Davis how to kill Mottier.

¶ 14    The jury found defendant guilty of solicitation of murder, rejecting his entrapment defense. Defendant was sentenced to 24 years' imprisonment.

¶ 15    On May 31, 2017, defendant filed for leave to file a successive postconviction petition, which initiated the present round of litigation. The trial court granted defendant's request.

¶ 16    In support of his new, verified, petition, defendant submitted considerable additional evidence. Defendant averred that he had been given the following medications: (1) Paxil, from March 22, 2002, to February 26, 2003, in amounts ranging from 20 to 40 milligrams, daily; (2) Trazadone, from March 23, 2002, to May 18, 2003, in amounts ranging from 75 to 350 milligrams, daily; (3) Lithium, from May 2, 2002, to May 26, 2002, 300 milligrams in the morning and 600

milligrams in the evening; and (4) Depakene, from May 29, 2002, to May 3, 2003, in amounts ranging from 500 to 2500 milligrams daily, administered in two doses.

¶ 17    Defendant also submitted a report from Dr. Daniel Wyma, who is board certified in the fields of neuropsychiatry and adolescent psychiatry. He has worked in the areas of adolescent and adult psychiatry since 1985. After recounting the facts of the case, Wyma then offered his professional evaluation of defendant.

¶ 18    Wyma noted that prior to March 2002, defendant's psychiatric history was significant for anxiety disorder and depression. In May 1999, defendant had been hospitalized following a suicide attempt. During follow-up, outpatient treatment, defendant was prescribed Effexor and then Paxil. Wyma opined that these drugs seemed to help.

¶ 19    After he was arrested on March 21, 2002, defendant's dosage of Paxil was increased to 30 milligrams per day. He was also given medication to help him sleep. A treatment note documents "mild euphoria." Wyma observed, "Thus, it does appear that at that time the patient's mental state was not showing typical depression and anxiety symptoms alone; there was also evidence of some possible elevation in his mood (i.e., euphoria)."

¶ 20    On March 31, 2002, Wyma stated, defendant was still receiving 30 milligrams of Paxil per day, and Trazadone (to treat insomnia) was increased to 150 milligrams nightly. At a subsequent evaluation, defendant was noted to be having trouble sleeping and increased anxiety, but he was not depressed. During a psychiatric assessment on April 9, 2002, defendant reported feeling " 'hyped (and) manicky.' " Wyma added, "By then the patient talked more directly about a past history of instability in his mood, racing thoughts, and possibly even some auditory hallucinations at one point." There were also "some references to paranoid thinking where [defendant] wondered if medications were being put in his food."

¶ 21    Wyma opined that by May 2, 2002, "the evidence that [defendant] was manic was very noticeable and the following features were noted: (1) accelerated thinking, (2) extra energy, (3) thoughts that were jumping from one topic to another, (4) a euphoric feeling, (5) being 'enamored with celebrity (status).' " Wyma further observed:

> "The patient was jumping from one topic to another, his behavior was erratic, and he had been posting different types of pictures on the walls of his cell. It was clear by this time that his thinking was out of touch with the reality of his situation. He would jump from one topic to the other. He was reading multiple books all at the same time. He was pacing, doing endless pushups, and showing little concern for his incarceration and pending legal problems."

As a result, on May 2, 2002, defendant was started on lithium, 300 milligrams in the morning and 600 milligrams in the evening. He was also placed on Depakene, which is a mood stabilizer. As his mood remained unstable, Depakene was increased. Wyman added, "Throughout the months of June, July and August 2002, his mood was characterized by instability, cycles of sleeplessness, periods of high excitement, times of extreme grandiosity, and even fabricated stories, such as saying that he had 'killed two people for the mob.' " Wyman stated that the claim about the mob "does not have any basis in reality." Additionally, "[t]here were further comments of ongoing mania that involved [defendant's] diagramming engine parts and placing them around his cell, writing out calculus equations, and talking about 'the Big Bang Theory.' " Defendant was not sleeping, and "his speech was pressured."

¶ 22    Wyma noted that Paxil was decreased and finally eliminated in February 2003. Defendant "remained quite manic until he was taken off this medication." Defendant reported that he did not feel well and was "mentally foggy" while taking Paxil. When Wyma evaluated defendant in 2012,

defendant reported that he felt "emotionally unbalanced" while in the DuPage County jail. After Paxil was discontinued, defendant's mood stabilized. Defendant stated that he had not experienced any depressive or manic episodes since March 2003.

¶ 23   Wyma opined that from the time when defendant's dosage of Paxil was increased in March 2002 until the time he stopped taking it the following year, defendant was suffering from bipolar mood disorder. Defendant underwent a "full manic episode." Wyma noted a history of alcohol abuse, which was consistent with bipolar disorder. Wyman opined that the manic episode was caused by the increased dose of Paxil defendant received. Nothing in the records indicates that defendant was warned of this possible side effect. Further, Wyman continued, as a result of his condition, defendant "lacked a substantial capacity to appreciate the criminality of his conduct and/or to conform his conduct to the requirements of the law at the time he made the statement that serve as the basis for his solicitation of murder for hire convictions." Wyma further opined that defendant was suffering from "an antidepressant induced manic episode during the period of time in which he made the statements that serve as the basis for his solicitation of murder for hire convictions."

¶ 24   Wyma found it significant that defendant was 21 years old at the time he was in the DuPage County Jail, as this "is the approximate age at which individuals who have bipolar illness often first present with a manic episode." Defendant's euphoria, while not consistent with his legal predicament, was nevertheless consistent with drug-induced mania. Defendant's self-reported symptoms were consistent with his condition.

¶ 25   Wyma explained that individuals suffering from bipolar disorder "manifest extreme impulsivity." By "impulsivity," Wyma, meant a tendency toward rapid and unplanned responses to stimuli without regard to the consequences to the impulsive person or others. Bipolar disorder

can also drastically impair an individual's judgment and insight. During a manic episode, an individual's thought process speeds up and "becomes disconnected from broader values." Decisions are made without forethought. Thus, "bipolar disorder can directly cause a patient to commit a criminal act they otherwise would not commit." Wyma again opined that defendant lacked the capacity to appreciate the criminality of his conduct or conform his behavior to the law.

¶ 26     Wyma further opined that the manner in which law enforcement investigated defendant exacerbated his vulnerability to impulsivity and lack of insight. Wyman explained, "Specifically, law enforcement conducted an undercover operation during which multiple individuals repeatedly initiated and/or continued conversation with [defendant] concerning his desires to have Thomas Mottier killed." Wyma stated that this provided multiple opportunities "for the impulsiveness and lack of insight characteristic of a manic phase to take over." Further, "continued conversation about having Mr. Mottier killed perpetuated [defendant's] inability to separate fantasy from reality and further diminished his already impaired appreciation for the consequences of his actions," Finally, Wyma cited the fact that defendant improved after being taken off Paxil as further evidence that the medications were driving defendant's manic state.

¶ 27     Defendant also submitted the report of Dr. James T. O'Donnell, a professor of pharmacology. O'Donnell reviewed defendant's medical and pharmacy records, trial transcripts, police records, jail records, witness statements, and pertinent scholarly literature. He read Wyma's report. He interviewed defendant on October 17, 2016, for about 90 minutes.

¶ 28     O'Donnell noted Wyma's opinion that defendant was in the midst of a full manic episode caused by the medications he was taking at the time he was incarcerated in the DuPage County jail. He further noted Wyma's opinion that defendant lacked the substantial capacity to appreciate the criminality of his conduct or to conform this conduct to the mandates of the law.

¶ 29    O'Donnel stated that Paxil is "well known to trigger mania—that is, manic switching." He continued, "Evidence from many sources confirms that [selective serotonin reuptake inhibitors], such as Paxil, commonly cause or exacerbate a wide range of abnormal mental and behavioral conditions." This can lead to "suicidality, violence, and other forms of extreme abnormal behavior." "Manic switching" has been reported with every type of antidepressant. O'Donnell explained:

> "Bipolar disorder often presents initially with one or more episodes of major depression, and an episode of mania or hypomania may first occur during treatment with an antidepressant, stimulant, or other agent with mood-elevating effects. Such 'switching' of mood into mania, a mixed-state, or psychosis can be dangerous. This switching is particularly prevalent among juveniles and young adults exposed to treatment with an antidepressant or stimulant for a depressive, anxiety, or attention disorder. Such pathological shifts of mood and behavior may represent adverse drug reactions or a manifestation of undiagnosed bipolar disorder."

According to O'Donnell, a "significant proportion" of individuals receiving acute treatment for "unipolar depression" "develop manic or hypomanic switch" during treatment.

¶ 30    O'Donnell opined that Wyma's conclusion that defendant suffered a manic switch caused by an increased dosage of Paxil was "consistent with the well-known pharmacological effects of [selective serotonin reuptake inhibitors] generally." Defendant was "in the prime age group (adolescents and young adults) for manic switching." O'Donnell noted that defendant's switching occurred after an increase in his dosage of Paxil. He added, "The conclusion that the Paxil induced [defendant's] manic episode is entirely consistent with the reported literature."

¶ 31    That defendant was also taking Trazadone, which is usually prescribed to treat insomnia, was significant and could increase the risk of manic switching. Further, that the doctors treating defendant while he was at the DuPage County jail prescribed mood stabilizers (Lithium and Depakote) provided further evidence that defendant was undergoing a manic episode, as these medications are commonly used to treat bipolar disorder. There was no indication that defendant had been warned of these side effects.

¶ 32    Finally, O'Donnell opined that the "criteria for determining causation are present in this case." He noted that manic switching while on antidepressants is widely reported. Defendant's episode occurred shortly after his dosage of Paxil was increased, and it terminated when he stopped taking that drug.

¶ 33    Defendant also supported his petition with affidavits from his parents, Paul and Susan Palinski. Paul averred that he regularly visited defendant in the DuPage County jail. Defendant was losing weight and had "patchy red spots over his face and body." Defendant reported that he was having difficulty sleeping, partly due to having disturbing dreams. He appeared "nervous and agitated." It was difficult to carry out a conversation with defendant, as he would not focus and jump from topic to topic. Defendant stated he was going to marry Karels and that he needed his parents to bring his suit and tie to the jail. Defendant discussed getting out of jail soon "without being able to articulate a rational reason for why that would occur."

¶ 34    Similarly, Susan averred that defendant "could not carry on a linear conversation" and was obsessed with trivial matters. Letters she received from defendant were incoherent and "would go off on various tangents." In the spring and summer of 2002, defendant was pale and his hands would shake. Defendant told Susan that he was not sleeping well, which was consistent with his appearance.

¶ 35    Defendant also submitted his own affidavit. In it, he averred that the was taking Effexor for depression in 1999 and 2000. He stopped when his depression improved because he was experiencing negative side effects. After he stopped, symptoms of depression returned. In March 2000, he underwent a psychiatric examination and was prescribed 20 milligrams of Paxil. While at the DuPage County jail, defendant's Paxil dosage was increased to 40 milligrams. He was never warned about the possibility that Paxil could cause a manic episode.

¶ 36    The trial court first ruled that defendant's petition was not barred by the fact that he did not file it until more than 10 years after a change in the law made it viable. The court then noted that while the experts proffered by defendant would establish that he was in a manic episode, it did not necessarily follow that this would allow defendant to escape legal culpability. It observed that many statements made by defendant contemporaneously with when he was trying to hire someone to kill Mottier indicated that defendant did appreciate the criminality of his conduct. It therefore concluded that this new evidence of involuntary intoxication was not of such a conclusive nature as to likely change the result on retrial. The trial court dismissed defendant's petition, and defendant now appeals.

¶ 37                              III. ANALYSIS

¶ 38    Defendant contends that the affidavits and reports he submitted from Wyma, McDonnell, his parents, and himself, establish a claim of actual innocence based on his involuntary intoxication caused by his ingestion of prescribed drugs at the time he made the statements that resulted in his conviction of solicitation of murder. Before addressing this claim, we must address the State's assertion that this claim is procedurally barred due to defendant's failure to timely raise it.

¶ 39    As noted, this is the second postconviction petition filed by defendant. Generally, the Postconviction Hearing Act (Act) (725 ILCS 5/122-1 et seq. (West 2016)) contemplates the filing

of a single postconviction petition, and a defendant must obtain leave of the court to file a successive petition. 725 ILCS 5/122-1(f) (West 2016). This typically requires a showing of cause and prejudice (see *People v. Smith*, 2014 IL 115946, ¶ 24); however, a defendant need not make this showing if he or she sets forth a claim of actual innocence (*People v. Ortiz*, 235 Ill. App. 3d 319, 330 (2009)). Here, the trial court granted defendant leave to file his successive petition on that basis. When such leave is granted, the petition advances automatically to the second stage of postconviction proceedings. *People v. Robinson*, 2020 IL 123849, ¶ 85.

¶ 40    During second-stage proceedings, a defendant "must make a substantial showing of actual innocence such that an evidentiary hearing is warranted." *People v. Sanders*, 2016 IL 118123, ¶ 37. Furthermore, all well-pleaded factual allegations not positively rebutted by the record are to be taken as true." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Dismissal is warranted only if the defendant's claims, liberally construed, fail to set forth a claim of actual innocence. *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). As this appeal comes to us following the second-stage denial of defendant's postconviction petition, review is *de novo*. *People v. Hall*, 217 Ill. 2d 324, 334 (2005).

¶ 41    With these standards in mind, we now turn to the State's initial argument.

¶ 42                  A. TIMELINESS OF DEFENDANT'S PETITION

¶ 43    In *People v. Hari*, 218 Ill. 2d 275, 278 (2006), our supreme court held, for the first time, that an involuntary-intoxication defense can be based on "an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor, the PDR [(Physicians' Desk Reference)], or the package insert." *Id.* at 292. In 2008, *People v. Alberts*, 383 Ill. App. 3d 374, 385 (2008), held that the holding of *Hari* applied retroactively. Prior to *Hari*, the defense was only

available if a defendant was intoxicated as the result of " 'trick, artifice, or force.' " *Id.* at 384 (quoting *People v. Rogers*, 123 Ill. 2d 487, 508 (1988) (*overruled by Hari*, 218 Ill. 2d at 294)).

¶ 44    Defendant's trial took place in November 2003, well before *Hari* was decided. Defendant filed his initial postconviction petition, *pro se*, on October 27, 2006. While this was nine months after the *Hari* decision was issued, it was almost two years before it was held to have retroactive effect. Additionally, defendant has submitted an affidavit averring that he was incarcerated at the time he filed his first postconviction petition and that his only resource for legal research was the prison law library. There was no access to computers or the internet; only hard-copy reporters were available. Defendant further averred that the reporters available were at least a year out of date. Therefore, he did not have access to the *Hari* decision at the time he filed his first postconviction petition. The trial court expressly found that defendant's postconviction petition was timely.

¶ 45    The State contends, nevertheless, that the fact that defendant did not file his successive postconviction petition until May 31, 2017, 11 years after *Hari* and 9 years after *Alberts*, bars the current action. The State then asserts, without reference to any direct authority: "[W]hen a defendant seeks to use a post-trial decision as 'new' evidence to support an actual innocence claim, the due diligence requirement dictates that such a claim must be made somewhat contemporaneously with the new decision." It then intimates that an 11-year delay does not meet this standard. However, contrary to the State's claim that defendant does not explain this delay, we note that defendant submitted an affidavit (as noted in the preceding paragraph) documenting his limited access to legal resources.

¶ 46    More importantly, we question the viability of the State's proposed standard that the "claim must be made somewhat contemporaneously with the new decision"—at least in the context of an actual innocence claim.  Regarding such a claim, the Act provides as follows:

> "When a defendant has a sentence other than death, no proceedings under this Article shall be commenced more than 6 months after the conclusion of proceedings in the United States Supreme Court, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.  If a petition for certiorari is not filed, no proceedings under this Article shall be commenced more than 6 months from the date for filing a certiorari petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.  If a defendant does not file a direct appeal, the post-conviction petition shall be filed no later than 3 years from the date of conviction, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.
>
> *This limitation does not apply to a petition advancing a claim of actual innocence*."  (Emphasis added.)  725 ILCS 5/122-1(c) (West 2016).

Thus, the State's timeliness argument runs contrary to the plain language of the Act.  Of course, where the language of a statue is clear, a court's duty is to simply enforce it as written.  *People v. Leavitt*, 2014 IL App (1st) 121323, ¶ 45.

¶ 47    For this same reason, the State's reliance on *People v. Ramirez*, 361 Ill. App. 3d 450 (2005), is misplaced.  In that case, a 3-year delay in bringing a postconviction petition following a change in the governing law was found to render the petition untimely.  *Id.* at 453.  However, *Ramirez* involved a sentencing issue.  *Id.* at 451.  Hence, the statutory exception for actual-innocence claims set forth above did not apply in *Ramirez*; in turn, *Ramirez* provides no guidance here.

¶ 48    Moreover, this argument arguably implicates the requirement that the claim be based on newly discovered evidence.  See *People v. Edwards*, 2012 IL 111711, ¶ 32 ("The elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial.").  However, in *Ortiz*, 235 Ill. 2d at 334, the supreme court explained that newly-discovered evidence is "evidence that has been discovered since the trial and that the defendant could not have discovered sooner through due diligence."  Here, the change in the relevant law and the evidence it led to were all posttrial occurrences.  As such, for the purposes of assessing defendant's claim, they are "newly discovered."  See also *People v. Smith*, 2015 IL App (1st) 140494, ¶ 19.

¶ 49    The State suggests that defendant's evidence is not new in the sense that all of the actual facts existed at the time defendant engaged in the acts that formed the basis of his convictions.  However, before *Hari* was decided, these facts were not relevant to defendant's case.  See *Hari*, 218 Ill. 2d at 278.  The question is not whether the evidence is "new," it is whether it is "newly discovered."  *Edwards*, 2012 IL 111711, ¶ 32.  How defendant could have discovered evidence that was not relevant to his case at the time of his trial is not apparent to us, and the State does not elucidate.  Indeed, since facts concerning defendant's involuntary intoxication were not relevant at the time of defendant's trial, it is questionable whether such facts could be termed "evidence" at all at the time of defendant's trial.

¶ 50    In short, we agree with the trial court and find that defendant's petition is not procedurally barred due to its purported untimeliness.

¶ 51                                    B. ACTUAL INNONCENCE

¶ 52    A claim of actual innocence is cognizable in a successive postconviction petition.  See *People v. Washington*, 171 Ill. 2d 475, 489 (1996).  To succeed on such a claim, a defendant must set forth evidence that is newly discovered, not merely cumulative, and sufficiently conclusive as to "probably change the result on retrial."  *Edwards*, 2012 IL 111711, ¶ 32.  The controlling issue is whether a defendant "has made a substantial showing of actual innocence such that an evidentiary hearing is warranted."  *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 34.  The trial court must accept all well-pleaded factual allegations that are not positively rebutted by the record.  *Pendleton*, 223 Ill. 2d at 473.

¶ 53    Here, defendant contends that newly discovered evidence shows that he was involuntarily intoxicated at the time he made the statements that form the basis of his conviction of solicitation of murder.  As explained above, this evidence is newly discovered, and nothing similar was presented at defendant's trial, so it is also noncumulative.  The question remains as to whether it is conclusive for the purposes of a claim of actual innocence.

¶ 54    Section 6-3 of the Criminal Code of 1961 (720 ILCS 5/6-3 (West 2002)) provided:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

As noted, in *Hari*, 218 Ill. 2d 275, the supreme court held that the unexpected side effects of prescription medications of which a defendant received no warning fell within the scope of "an intoxicated or drugged condition" as defined in section 6-3.  Further, note that the latter portion of the statute sets forth two circumstances, disjunctively, that constitute an affirmative defense: (1) that the defendant lacks the capacity to appreciate the criminality of his or her conduct, and (2)

that the defendant is unable to conform his or her conduct to the law. See *People v. Eckhardt*, 156 Ill. App. 3d 1077, 1090 (1987) ("An accused who understood the nature of his or her conduct and appreciated its wrongfulness will still be excused from criminal liability if his or her ability to consciously refrain from that conduct was substantially impaired by a mental disease or defect.").

¶ 55    The trial court made extensive findings regarding defendant's ability to appreciate the criminality of his conduct. The trial court noted that the mere fact that defendant was in a manic episode would not be a defense in itself. It then noted that there were many indications that defendant appreciated the criminality of his conduct.

¶ 56    Indeed, the record is replete with statements made by defendant where he recognizes the nature of his actions. For example, defendant referred to Garvin as a "temptation from Satan" and stated that "God doesn't want me to do this." He expressed surprise that Karels was considering assisting with the plan to kill Mottier.  Discussing the killing of Mottier, defendant stated that he did not want to make a bad decision. He expressed concern to Williams about the murder being tied to him.

¶ 57    Defendant points out that, in addition of the extensive evidence that he was in a manic phase, Wyma opined that he could not appreciate the criminality of his conduct. Defendant contends that to reject this evidence in favor of his statements recognizing his culpability, the trial court had to engage in factfinding, which is impermissible at the second stage of postconviction proceedings. Defendant cites *People v. Domagala*, 2013 IL 113688. In that case, the defendant was the caretaker for an 84-year-old man. Two witnesses had observed the defendant strike the victim's face and apply pressure to the victim's throat. The victim was taken to a hospital, and a feeding tube was inserted. The victim was discharged to a nursing home. While there, the victim

pulled the feeding tube out several times, which led to an infection that caused the victim's death. The defendant was convicted of his murder.

¶ 58    The defendant filed a postconviction petition alleging his counsel was ineffective for failing to investigate whether the victim's death was actually caused by the gross negligence of his medical providers. *Id.* ¶ 24. He attached a report from an expert witness supporting his petition. In the report, the expert opined that a swallowing study had been performed incorrectly and that it was negligence to insert the feeding tube. At trial, a doctor had testified that the swallowing study had been performed correctly. The supreme court held that the resolution of the conflict between these two experts required factfinding, which could only take place at the third stage of postconviction proceedings. *Id.* ¶ 46.

¶ 59    We find *Domagala* distinguishable. In that case, there was a direct, evidentiary conflict between two experts opinions. Here, we are confronted with a conflict between Wyma's opinion testimony and defendant's repeated, express statements recognizing the criminality of his proposed conflict. While, as *Domagala* teaches, resolving evidentiary conflicts is inappropriate during second-stage proceedings, the trial court still must nevertheless determine whether defendant's claims are "positively rebutted by the record." *Pendleton*, 223 Ill. 2d at 473. Here, defendant's repeated, express statements about his own state of mind provide compelling evidence that he understood the criminality of his conduct such that the record positively rebuts any claim to the contrary. Moreover, given defendant's many, plain statements about his culpability, we could not find that Wyma's opinions are so conclusive as to "probably change the result on retrial," as would be necessary for defendant to prevail here. See *Edwards*, 2012 IL 111711, ¶ 32.

¶ 60    We now turn our attention to the question of whether defendant was involuntarily intoxicated such that he could not conform his conduct to the requirements of the law. See 720

ILCS 5/6-3 (West 2002). We initially note that the trial court ruling on defendant's petition does not discuss this portion of the affirmative defense. It would have been better for the trial court to address the entire statute; nevertheless, as our review is *de novo* (*Hall*, 217 Ill. 2d at 334), this omission does not prevent us from conducting meaningful review here. However, we also note that the State's treatment of the second prong of the involuntary-intoxication defense is limited as well. Defendant devoted an entire section of his opening brief to this issue. While the State mentions the second prong a few times, its discussion of evidence that purportedly refutes defendant's claim concerns the first prong.

¶ 61     This is a significant omission, as the evidence defendant advances regarding the second prong is considerable. Wyma opined that defendant lacked the ability to conform his conduct to the law. Defendant points out that the crime of which he was convicted—solicitation of murder for hire—was based entirely on statements he made. A person in a manic phase is prone to impulsivity. As he was prone to making impulsive statements, he was particularly vulnerable to committing an inchoate offense based entirely on his statements.

¶ 62     The State does not argue, and the trial court did not find, that defendant was not in a manic episode while he was making the statements that form the basis of his conviction. The notion that defendant was in a manic state is supported by the opinion of O'Donnell regarding the side effects of the drugs defendant was taking and the observations of defendant's parents, in addition to Wyma's opinions. The question remains whether that condition impaired his ability to conform his conduct to the law.

¶ 63     On this issue, Wyma explained that individuals in a manic episode typically manifest impulsivity and lack of insight. During a manic phase, an individual's "thought processes speed

up and become disconnected from broader values." The individual is prone to make decisions without any forethought. Wyma continued:

"It is also my opinion that the manner in which [defendant's] conduct was investigated by law enforcement exacerbated the vulnerability to impulsivity and lack of insight consistent with the pathology of his mood disorder. Specifically, law enforcement conducted an undercover operation during which multiple individuals repeatedly initiated and/or continued conversation with [defendant] concerning his desires to have Thomas Mottier killed."

Wyma noted many instances that Garvin approached defendant about having Mottier killed. When defendant told Garvin that he did not know anyone he could hire to kill Mottier, Garvin offered to call some gang members he purportedly knew.

¶ 64 Further, when Karels expressed reluctance to aid defendant, law enforcement recruited Williams to meet with defendant about the killing. At the direction of the police, Williams spoke with defendant about the killing and asked if he wanted it done. She also told defendant that she had the money to pay for it.

¶ 65 Wyma concluded:

"By repeatedly approaching [defendant] and initiating conversation with him about having Mr. Mottier killed, law enforcement provided several opportunities for the impulsiveness and lack of insight characteristic of a manic phase to take over. Moreover, continued conversation about having Mr. Mottier killed perpetuated [defendant's] inability to separate fantasy from reality and further diminished his already impaired appreciation for the consequences of his actions."

¶ 66    While the State and trial court both identified considerable evidence that indicates that defendant appreciated the criminality of killing Mottier, neither significantly addressed the issue of whether defendant's manic phase prevented him from conforming his conduct to the law. Defendant's burden here is to show that the evidence at issue is "of such conclusive character that it would probably change the result on retrial." *Edwards*, 2012 IL 111711, ¶ 32. Given the evidence cited by defendant on this point, particularly in light of the lack of contradictory evidence identified by the State, we conclude that defendant "has made a substantial showing of actual innocence such that an evidentiary hearing is warranted." *Lofton*, 2011 IL App (1st) 100118, ¶ 34. Accordingly, a third-stage evidentiary hearing must be held.

¶ 67                                    IV. CONCLUSION

¶ 68    In light of the foregoing, we reverse the order of the circuit court of Du Page County dismissing defendant's postconviction petition and remand this cause so that a third-stage postconviction hearing can be held.

¶ 69    Reversed and remanded, with directions.