**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 230371-U

Order filed March 6, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0371 Circuit No. 02-CF-2346 |
| | ) | |
| ADAM P. PALINSKI, | ) ) | Honorable Ann Celine O'Hallaren Walsh, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Peterson and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The court did not err in denying defendant's postconviction petition.

¶ 2     Defendant, Adam P. Palinski, appeals from the denial of his postconviction petition following a third-stage evidentiary hearing on his actual innocence claim. Defendant contends the denial of his petition was manifestly erroneous where newly discovered evidence overwhelmingly established an involuntary intoxication defense that was previously unavailable under Illinois law. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          Defendant was charged on August 15, 2002, with solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2002)) after a fellow inmate at the Du Page County jail reported that defendant intended to have a witness against him killed. He was arrested the following day. Defendant had previously been arrested in March 2002 for an unrelated offense. The State produced numerous recorded jail conversations at defendant's jury trial. These conversations included discussions about the method of killing, payment, soliciting funds for the payment, and reservations about going forward with the plan. Defendant pursued an entrapment defense at trial. The jury rejected his defense, and the trial court sentenced him to 24 years' imprisonment. Defendant's direct appeal was unsuccessful. *People v. Palinski*, No. 2-04-0082 (2005) (unpublished order under Illinois Supreme Court Rule 23). So was his 2006 petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2006)).

¶ 5          In May 2017, the circuit court granted defendant leave to file a successive postconviction petition. Defendant's petition raised an actual-innocence claim based on the affirmative defense of involuntary intoxication, which was not legally available in his circumstances until 2006. See *People v. Hari*, 218 Ill. 2d 275, 278 (2006) (recognizing, for the first time, that an involuntary intoxication defense may be based on an unexpected and unwarned side effect of prescribed medication). The court later dismissed the petition after second-stage postconviction proceedings.

¶ 6          The Second District reversed and remanded for an evidentiary hearing. *People v. Palinski*, 2020 IL App (2d) 180341-U, ¶ 68. In doing so, the court held defendant had presented newly discovered evidence for purposes of his claim. The court rejected the State's argument that the evidence was "not new in the sense that all of the actual facts existed at the time defendant engaged in the acts that formed the basis of his convictions." *Id.* ¶ 49. The court pointed out that the change

2

in relevant law did not occur until after defendant's trial. *Id.* ¶ 48. Thus, at trial, the evidence concerning defendant's involuntary intoxication from prescription drugs was not relevant and, therefore, could not have been discovered at that time. *Id.* ¶ 49.

¶ 7        At the evidentiary hearing, defendant's mother, Susan Palinski, testified that in 1999 and 2000, defendant struggled with mental health issues including depression. Defendant began seeing a psychiatrist. Susan attended an appointment with him where he was prescribed Paxil. She testified neither she nor defendant were informed Paxil could cause manic episodes or lead to delusions. Susan visited defendant in jail after his March 2022 arrest. At one visit, Susan recalled defendant could not "follow a complete thought" or engage in a normal conversation with her. She said defendant kept "going back and forth with different thoughts and *** interrupting us and going on onto another tangent." Susan received letters from defendant during his incarceration which were "rambling," "wordy," and not cohesive. Defendant appeared to be losing weight, not sleeping well, and unable to focus.

¶ 8        Defendant's father, Paul Palinski, visited defendant in jail weekly after his March 2002 arrest. Paul testified defendant was unable to sleep well due to frightening dreams. Defendant appeared thinner and pale. Defendant was frequently tired and "out of sorts" during visits. It was difficult to converse with defendant because he would frequently change subjects, even within the same sentence, and move from one unrelated topic to another in succession. His speech was very rapid and difficult to understand, and he was fidgety and unable to stay still. Defendant appeared to be very impulsive and delusional. He did not seem to appreciate the severity of his situation, often discussing his post-release plans without explaining how he expected to be released.

¶ 9        James O'Donnell, a registered pharmacist, testified that selective serotonin reuptake inhibitors (SSRIs), like Paxil, are designed to alleviate depression by increasing serotonin

availability in the brain. Paxil use could cause side effects, however, including insomnia, agitation, increased anxiety, increased depression, violent behavior, and manic switching. Individuals experiencing a manic episode are "on all the time," potentially suffering delusions of grandeur and unrealistic thoughts, and preoccupying themselves with unnecessary activities, depending on the severity of the episode. Manic switching is more likely to occur in adolescents and young adults, during the first few months of therapy, and when dosages are increased. Using Trazodone with Paxil increases the risk of manic switching.

¶ 10       On reviewing defendant's hospital and jail records, O'Donnell opined that defendant was suffering from severe Paxil-induced mania. O'Donnell cited the jail physician's documented signs of and treatment for bipolar disorder, defendant's reported behavior changes, and the known risk factors. He noted defendant's symptoms dissipated when his Paxil usage was discontinued. The State cross-examined O'Donnell at length about his qualifications in pharmacology, his knowledge about Paxil and other antidepressants, the degrees he held, prior lawsuits filed against him for falsely advertising that he possessed a doctorate in pharmacology, and occasions where his expert or opinion testimony was disallowed by various courts.

¶ 11       Dr. Wyma, a board-certified psychiatrist, testified he had previously evaluated defendant in August 2012. In connection with his evaluation, Wyma reviewed defendant's medical and psychiatric records from the jail and an investigative report that summarized statements made by defendant at the jail.

¶ 12       Wyma noted defendant's mental health struggles before his incarceration for which he had been prescribed Paxil. Wyma testified that numerous potential side effects existed for Paxil, including mania. He described mania as a "mood state" of accelerated, expansive thinking that may include more grandiose thinking, not appreciating the seriousness or limitations of one's

4

actions, and "poor sleep, poor judgment, maybe more impulsivity." After defendant's arrival at the jail, reports indicated Paxil helped his sleep but, as time progressed, defendant's thinking became more accelerated, his sleep decreased, and he experienced mild euphoria. The jail psychiatrist increased defendant's Paxil dosage and prescribed Trazodone to help him sleep. Wyma indicated the risk of cycling into a manic state based on Trazodone was very minimal but the combination of Trazodone with Paxil "would increase it some."

¶ 13        Defendant's medical reports from March to October 2002 documented various complaints and behavioral notes, including difficulty sleeping, increased anxiety, increased energy, racing thoughts, and pressured speech. On several occasions, the records indicated defendant reported feeling "more stable" but occasionally felt "manicky." Defendant was prescribed medication for bipolar disorder. In July 2002, the records noted defendant was able to converse better and was calmer. The next month, however, defendant complained of an inability to focus and feeling highly excitable. In January 2003, defendant's mood appeared to be stabilizing and in March 2003, he reported feeling better after discontinuing the use of Paxil.

¶ 14        Wyma opined defendant was suffering from a "full-blown manic episode" by September 15, 2002, and it was possible the episode started as early as May 2002 based on reported symptoms. Wyma testified mania could affect an individual's ability to think, speak, and make decisions. He explained that, commonly, a person experiencing mania has racing thoughts and, as a result, becomes more impulsive because "you don't have to think long[;] you have a thought and an action just follows directly." When asked whether defendant could conform his conduct to the law at the time he made the incriminating statements, Wyma stated:

> "[Mania] will affect somebody's ability to do what they would normally do, adhere
> to rules, adhere to people's expectations of them. It will affect it. Does it stop it

5

completely or does it make it a lot tougher? Depends how far along the road you go, but it is clearly known to decrease *** your ability to restrain yourself ***." He noted that a person suffering from mania is more susceptible to the power of suggestion.

¶ 15    Wyma testified he had not met defendant in person. He conducted his 2012 interview over the telephone. Wyma stated he did not recall listening to the audio recordings of defendant's jail conversations. He reviewed written transcripts of the dialogue. Wyma clarified he believed defendant experienced a manic episode which lasted several months while in jail "with some variability up and down." He indicated the August 2002 jail records containing defendant's complaints of feeling "manicky over the past three weeks" included a doctor's note that defendant did not believe he was experiencing any "real side effects to [the] meds." When confronted with the numerous conversations defendant had with multiple people at the jail from May to August 2002 regarding killing the witness, Wyma agreed the statements did not sound like impulsive statements, but "sound[ed] like it had thought that went into it." Wyma testified that once a person starts down an impulsive path, "it may be a lot more difficult for that individual to know how to contain that, even if, at that point, their mania may have quieted down." The incriminating statements, however, indicated an awareness of cause and effect.

¶ 16    The State played one recorded conversation from July 28, 2002, in which defendant stated he could feign mental illness such as bipolar disorder or schizophrenia if necessary. Wyma had not previously heard the audio recording of this conversation. Having only read the transcripts, he was unaware of defendant's speech patterns during his jail conversations. Wyma indicated defendant was speaking at a normal rate of speed which, coupled with the content of his conversation, could indicate malingering. He noted, however, the jail psychiatrist indicated no

concerns about malingering and defendant may have been making statements about feigning mental illness because of grandiosity as opposed to malingering.

¶ 17    Wyma testified he did not believe defendant was in a constant manic state during the three months he discussed killing the witness. Wyma nevertheless believed defendant could not conform his conduct to the law because it may have been difficult for him to stop the plan when he was no longer in his manic state. Wyma admitted he was speculating, however, because he had not spoken enough with defendant.

¶ 18    Defendant testified he was first prescribed Paxil in April 2000. He was informed of possible side effects but was not told Paxil could lead to a manic episode by any medical provider who prescribed him Paxil. In May 2002, he began to feel "very agitated, very restless, and *** manicky." Defendant testified he developed a preoccupation with having the witness killed to prevent his testimony. Defendant indicated that during these conversations, he experienced racing thoughts and developed a preoccupation with organized crime, which was not something he had experienced before his arrest. He denied having an elaborate plan to effectuate the killing. Defendant testified his conversations had a surreal quality to them and did not feel like they had any real consequences.

¶ 19    The court issued a written order denying defendant's successive postconviction petition. In so ruling, it found O'Donnell's and Wyma's opinion testimony not credible. The court concluded O'Donnell was not qualified to render an opinion as to whether defendant was suffering from a manic episode while incarcerated. It further concluded Wyma's contention that defendant could not conform his conduct to the law lacked sufficient support. It explained that Wyma did not speak with defendant enough to be able to answer specific questions about defendant's manic state, did not meet with defendant in person, did not listen to the audio recordings of defendant's

7

conversations which formed the basis of his solicitation-of-murder-for-hire conviction, and did not offer support for his opinion that defendant was suffering from Paxil-induced mania such that he could not conform his conduct to the law. The court found defendant had not met his burden to show the evidence was sufficiently conclusive to change the result on retrial.

¶ 20    This appeal followed.

¶ 21                                                    II. ANALYSIS

¶ 22    On appeal, defendant argues the court's denial of his successive postconviction petition was manifestly erroneous where the newly discovered evidence overwhelmingly established his actual innocence through the previously unavailable involuntary intoxication defense.

¶ 23    Initially, we note that we ordered the parties to file supplemental briefs discussing whether we were bound by the Second District's determination that defendant had presented newly discovered evidence to support his actual innocence claim. See *Palinski*, 2020 IL App (2d) 180341-U, ¶ 68. The law-of-the-case doctrine generally prohibits relitigation of an issue decided in a prior appeal. *People v. Oaks*, 2012 IL App (3d) 110381, ¶ 18. This doctrine does not control, however, when a higher reviewing court makes a contrary ruling on the same issue after the lower court's decision. *People v. Anderson*, 2015 IL App (2d) 140444, ¶ 27. Our order instructed the parties to address the effect of *People v. Taliani*, 2021 IL 125891, a case involving a strikingly similar actual-innocence claim, on the judgment in *Palinski*, 2020 IL App (2d) 180341-U.

¶ 24    At issue in *Taliani* was the denial of leave to file a second successive postconviction petition. *Taliani*, 2021 IL 125891, ¶ 2. The defendant was convicted of first degree murder and aggravated battery after he shot his girlfriend and her mother with a sawed-off shotgun, killing the girlfriend and seriously injuring the mother. *Id.* ¶¶ 1, 6. In his second successive postconviction petition, the defendant raised an actual-innocence claim based on the defense of involuntary

8

intoxication. *Id.* ¶ 45. He contended that while it was known at the time of trial he was taking prescribed medication, it was not known that those medications, when taken together, could cause heightened irritability, altered consciousness, and confusion. *Id.* ¶ 60. According to the defendant, the fact he was taking the medication had taken on new significance after the supreme court, in 2006, recognized the defense of involuntary intoxication based on unwarned side effects of prescription medication. *Id.*

¶ 25    In affirming the denial of leave to file a second successive postconviction petition, the supreme court remarked, "A new defense is a new theory; it is not new evidence." *Id.* ¶ 70. Out of context, this remark might be understood to categorically bar actual-innocence claims that are based on defenses that were not legally available at the time of trial. In context, however, we find no reason to read so much into the court's remark. Indeed, immediately following this remark, the supreme court explained the defendant's motion for leave failed because he had not attached any affidavits or contemporary documentation to establish he was, in fact, involuntarily intoxicated.[1] *Id.* The mere availability of the new defense was not sufficient to meet the defendant's burden of presenting that evidence. *Id.* ¶ 72.

¶ 26    We conclude *Taliani* does not allow us to revisit whether defendant should have ever been granted leave to file a successive petition. See *Anderson*, 2015 IL App (2d) 140444, ¶ 27. Here, defendant submitted the evidence that was absent in *Taliani*. He submitted affidavits from himself, his mother, and two physicians to support his claim that he was, in fact, involuntarily intoxicated.

---

[1]As an aside, we note the *Taliani* court assumed for the sake of analysis that an actual-innocence claim can challenge the *mens rea* of the offense, as typical actual-innocence claims challenge the *actus reus* of the offense. *Taliani*, 2021 IL 125891, ¶ 66. This is a fairly important assumption that neither party comments on in this appeal. We nevertheless make the same assumption.

Those affidavits contained observations and opinions regarding defendant's behavior around the time of the offense. Accordingly, the Second District's determination stands as the law of the case.

¶ 27    Having resolved this preliminary issue, we turn to the parties' arguments. This appeal arises from third-stage proceedings under the Act. At the third stage, a defendant's allegations are no longer presumed to be true. See *People v. House*, 2023 IL App (4th) 220891, ¶ 78. Instead, "the trial court acts as a factfinder, making credibility determinations and weighing the evidence." *People v. Reed*, 2020 IL 124940, ¶ 51. The court's findings regarding issues of credibility and fact will not be reversed unless those findings are manifestly erroneous. *Id.* Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 28    "[T]o succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Id.* ¶ 96. Once the court concludes the evidence presented at the evidentiary hearing was new, material, and noncumulative, it must then "consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97.

¶ 29    The parties focus their arguments on whether the evidence presented was so conclusive as to probably change the result on retrial. Section 6-3 of the Criminal Code of 1961 (720 ILCS 5/6-3 (West 2002)) provided: "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Unexpected side effects of prescription medications which a defendant was not warned about falls within the scope of "an intoxicated or drugged condition" as defined

10

in section 6-3. *Hari*, 218 Ill. 2d at 291. The Second District previously found the record positively rebutted any claim that defendant was unable to appreciate the criminality of his conduct. *Palinski*, 2020 IL App (2d) 180341-U, ¶ 59. Nevertheless, a defendant is excused from criminal liability if "a mental disease or defect" substantially impaired his or her ability to consciously refrain from the wrongful conduct, despite appreciating the criminality of the conduct. *People v. Eckhardt*, 156 Ill. App. 3d 1077, 1090 (1987). Thus, the issue at the evidentiary hearing was whether defendant was involuntarily intoxicated such that he was unable to conform his conduct to the law.

¶ 30    The evidence at the hearing established that the use of Paxil can cause manic episodes. Defendant's medical records from the jail contained reports that he was experiencing symptoms commonly associated with mania. Other records indicated defendant did not believe he was experiencing any side effects from his prescribed medication and contained reports that defendant felt calmer and more stable. Wyma believed defendant was not in a constant manic state between May and August 2002 but may have had difficulty stopping his plan outside the manic state. Wyma had not listened to audio recordings of defendant's conversations and had not heard defendant's speech patterns in coming to his conclusion. Upon hearing one such conversation at the evidentiary hearing, Wyma indicated defendant's speech pattern was normal. Further, Wyma indicated the statements made by defendant over the course of several months appeared to have been thoughtful and not impulsive. He again opined defendant may have been unable to stop the planning once he had started it but later admitted to the court this was speculation because he had not spoken to defendant enough to know if that was true in this instance.

¶ 31    Wyma testified as to the notes of Dr. Corcoran, a psychiatrist who evaluated defendant in relatively close proximity to August 15, 2002, the date defendant is alleged to have perfected his solicitation to commit murder. Corcoran's July 11, 2002, notes indicated defendant was less manic

11

and able to "converse better in routine conversation." Wyma testified it appeared the mood stabilizers were having some desirable effect while not impairing defendant as before. Three days after defendant's arrest on the solicitation charge, Corcoran reported defendant was not sleeping well, had pressured speech, and was at the "high end of excitable." On September 15, 2002, Corcoran reported defendant appeared "manicky" and that he exhibited disorganized thoughts. Defendant had adorned his cell with drawings of engines and calculus equations and was talking about "the Big Bang Theory." According to Wyma, defendant's conduct was consistent with Corcoran's notes that defendant was bipolar and perhaps hypermanic.

¶ 32        Wyma read a number of transcripts of phone and other recordings of defendant obtained during the investigation, but he was unaware of the July 28, 2002, telephone conversation in which defendant boasted he could feign being bipolar or schizophrenic. Wyma testified defendant was speaking at a normal rate and that his statements "could be" a textbook example of malingering, but that bipolar disorder and malingering are not mutually exclusive.

¶ 33        The court found that the newly presented evidence of involuntary intoxication was not sufficient to undermine its confidence in the correctness of the verdict. The court explained it found the testimony of Wyma not credible, highlighting the lack of a definitive opinion about defendant's manic state and Wyma's repeated admissions of insufficient contact with defendant. The court acknowledged Wyma's testimony regarding impulsivity but found no credible evidence to support the claim that defendant was in a manic state and thus unable to conform his conduct to the law. The record contained months of conversations and planning in which defendant participated, and which Wyma admitted seemed to lack impulsivity.

¶ 34        The court found O'Donnell was not qualified to opine on defendant's ability to conform to the requirements of the law. We have no basis to disturb the court's finding. O'Donnell holds a

12

degree in pharmacy, not pharmacology. And although O'Donnell is a board-certified pharmacologist, his certification is in research-oriented "applied pharmacology," rather than "clinical pharmacology," which focuses on clinical settings and requires a medical license. Notably, while O'Donnell's *curriculum vitae* indicates he has been published 335 times, O'Donnell has never authored an article concerning Paxil or other SSRIs. The trial court properly found O'Donnell unqualified to render an opinion.

¶ 35   Our conclusion accords with the evaluations of two courts on O'Donnell's qualifications. In 2002, a federal court concluded O'Donnell lacked the required credentials to testify regarding Paxil and its associated warnings, noting his claim to the title "doctor" was based solely on the completion of a one-year Doctor of Pharmacy program in 1971, in which he took just one pharmacology-related course. *Newton v. Roche Laboratories, Inc.*, 243 F. Supp. 2d 672, 678 n.3 (W.D. Tex. 2002). The court observed O'Donnell admitted he had previously falsely advertised himself as possessing a doctorate in pharmacology to attract more interest from lawyers. *Id.* In 2004, another federal court determined O'Donnell's qualifications to testify regarding SSRIs, and Paxil in particular, were "non-existent." *Devito v. Smithkline Beecham Corp.*, CIV.A. 02-CV-0745NPM, 2004 WL 3691343, at *7 (N.D.N.Y. Nov. 29, 2004).

¶ 36   Based on the record before us, we cannot say the trial court's credibility and qualification determinations were arbitrary, unreasonable, or not based on the evidence. Accordingly, we affirm the court's denial of defendant's successive postconviction petition.

¶ 37   In reaching this conclusion, we reject defendant's contention that the circuit court improperly conflated the disjunctive prongs of the involuntary intoxication defense. See *Taliani*, 2021 IL 125891, ¶ 70 (an involuntarily intoxicated defendant lacks the substantial capacity to "*either* appreciate the criminality of his conduct *or* conform his conduct to the law" (emphases

13

added)). The court mentioned that defendant's understanding of the consequences he faced showed he could conform his conduct to the law. To be sure, one may understand the potential consequences of an action but still be unable to conform his actions to the law. See *Eckhardt*, 156 Ill. App. 3d at 1090. It does not follow, however, that a defendant's understanding of the consequences cannot be a factor in determining whether he is able to conform his actions to the law. The court's statements make clear it considered defendant's understanding of the consequences *in conjunction with* his months of planning, coordination, and deliberation. See *Taliani*, 2021 IL 125891, ¶ 69 (requiring a persuasive showing of involuntary intoxication based on new evidence "considered along with all the evidence presented at trial"). Ultimately, the court found no credible evidence that a prolonged manic state caused impulsivity and thus concluded defendant could conform his conduct to the law. Its limited references to defendant's appreciation of his conduct's seriousness do not overcome that conclusion.

¶ 38                                    III. CONCLUSION

¶ 39        For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 40        Affirmed.